[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14009
_____

D.C. Docket No. 1:11-cv-22026-MGC


DR. BERND WOLLSCHLAEGER et al.,

Plaintiffs/Appellees,

versus

GOVERNOR, STATE OF FLORIDA et al.,

Defendants/Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 16, 2017)

Before ED CARNES, Chief Circuit Judge, and TJOFLAT, HULL, MARCUS, WILSON, WILLIAM PRYOR, MARTIN, JORDAN, ROSENBAUM, JULIE CARNES, and JILL PRYOR, Circuit Judges.

JORDAN, Circuit Judge: [*]

_____

[*] There are two majority opinions for the en banc Court, one by Judge Jordan and one by Judge Marcus. Judge Jordan's opinion is joined by Chief Judge Ed Carnes and Judges Hull, Marcus, William Pryor, Martin, Rosenbaum, Julie Carnes, and Jill Pryor. Judge Marcus' opinion is joined by Judges Hull, Wilson, Martin, Jordan, Rosenbaum, and Jill Pryor.

Despite its majestic brevity—or maybe because of it—the freedom of speech clause of the First Amendment sometimes proves difficult to apply. *See, e.g.*, Burt Neuborne, Madison's Music: On Reading the First Amendment 5 (2015) ("Reading the First Amendment isn't easy."); *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 218 (3d Cir. 2001) (Rendell, J., concurring) ("[T]here are no easy ways in the complex area of First Amendment jurisprudence."). Yet certain First Amendment principles can be applied with reasonable consistency, and one of them is that, subject to limited exceptions, "[c]ontent-based regulations [of speech] are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).

This particular principle looms large in this case, which concerns certain provisions of Florida's Firearms Owners' Privacy Act, Chapter 2011–112, Laws of Florida (codified at Fla. Stat. §§ 790.338, 456.072, 395.1055, & 381.026). And that is because some of FOPA's provisions regulate speech on the basis of content, restricting (and providing disciplinary sanctions for) speech by doctors and medical professionals on the subject of firearm ownership.

Shortly after FOPA was enacted in 2011, a number of doctors and medical organizations filed suit in federal court against various Florida officials, challenging some of the Act's provisions as unconstitutional. Ruling on cross-motions for summary judgment, the district court held that FOPA's record-

2

keeping, inquiry, anti-discrimination, and anti-harassment provisions violated the First and Fourteenth Amendments, and permanently enjoined their enforcement. *See Wollschlaeger v. Farmer*, 880 F. Supp. 2d 1251 (S.D. Fla. 2012) (*Wollschlaeger I*). The state officials appealed, and a divided panel of this court issued three opinions—each using a different First Amendment standard of review—upholding the challenged provisions of FOPA. *See Wollschlaeger v. Governor of Fla.*, 760 F.3d 1195 (11th Cir. 2014) (*Wollschlaeger II*); *Wollschlaeger v. Governor of Fla.*, 797 F.3d 859 (11th Cir. 2015) (*Wollschlaeger III*); *Wollschlaeger v. Governor of Fla.*, 814 F.3d 1159 (11th Cir. 2015) (*Wollschlaeger IV*). We voted to rehear the case en banc and heard oral argument in June of 2016.

Exercising plenary review, *see ACLU of Fla., Inc. v. Miami-Dade County Sch. Bd.,* 557 F.3d 1177, 1206 (11th Cir. 2009), and applying heightened scrutiny as articulated in *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 563–67, 571–72 (2011), we agree with the district court that FOPA's content-based restrictions—the record-keeping, inquiry, and anti-harassment provisions—violate the First Amendment as it applies to the states. *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech[.]"); *Stromberg v. California*, 283 U.S. 359, 368 (1931) ("[T]he conception of liberty under the due process clause of the Fourteenth Amendment embraces the right of free speech."). And

because these three provisions do not survive heightened scrutiny under *Sorrell*, we need not address whether strict scrutiny should apply to them. We also conclude, this time contrary to the district court, that FOPA's anti-discrimination provision—as construed to apply to certain conduct by doctors and medical professionals—is not unconstitutional. Finally, we concur with the district court's assessment that the unconstitutional provisions of FOPA can be severed from the rest of the Act.

## I

As part of their medical practices, some doctors routinely ask patients about various potential health and safety risks, including household chemicals, drugs, alcohol, tobacco, swimming pools, and firearms. *See* Joint Statement of Undisputed Facts, D.E. 87, at ¶ 18. A number of leading medical organizations, and some of their members, believe that unsecured firearms "in the home increase risks of injury, especially for minors and those suffering from depression or dementia." *Id.* at ¶ 20.

In an effort to prevent and reduce firearm-related deaths and injuries, particularly to children, the American Medical Association "encourages its members to inquire as to the presence of household firearms as a part of childproofing the home and to educate patients to the dangers of firearms to children." *Id.* at ¶ 4. Health Policy H-145.990, enacted by the AMA in 1989,

4

"supports increasing efforts to reduce pediatric firearm morbidity and mortality by encouraging its members to (a) inquire as to the presence of household firearms as a part of childproofing the home; (b) educate patients to the dangers of firearms to children; (c) encourage patients to educate their children and neighbors as to the dangers of firearms; and (d) routinely remind patients to obtain firearm safety locks, to store firearms under lock and key, and to store ammunition separately from firearms[.]"

The American Academy of Pediatrics and the American Academy of Family Physicians—as well as their Florida chapters—follow a similar approach. They "recommend that pediatricians incorporate questions about firearms into the patient history process and . . . have policies stating that firearm safety education to patients is a necessity." Joint Statement of Undisputed Facts, D.E. 87, at ¶ 16.

## A

In 2011, the Florida Legislature learned that a pediatrician in Ocala had reportedly told a mother that she would have to find a new physician for her child due to her refusal to disclose information about firearm ownership in the family home. The pediatrician explained that he asked all of his patients the same questions "in an effort to provide safety advice in the event there was a firearm in the home." *Id.* at ¶ 3. He also said that he asked other similar questions, such as whether there was a pool in the home, to give safety advice to parents. The mother

felt that the question "invaded her privacy," but the record is silent as to whether she ultimately answered the questions posed to her about firearms. *Id.*

The Florida Legislature also learned, anecdotally, about five other incidents in which patients complained that doctors and medical professionals had asked unwelcome questions or made purportedly improper comments regarding their ownership of firearms. A state representative said that his daughter's pediatrician inquired if he owned a firearm, and then asked him to remove the firearm from the home. *Id.* at ¶ 5. An email described how a mother "was separated from her children while medical personnel . . . interrogated" them about firearm ownership and put information about such ownership in their medical records. *Id.* at ¶ 6. One doctor refused to treat a child because he wanted to know if there were firearms in the home. *Id.* at ¶ 8. A patient, according to a state senator, was told that disclosing firearm ownership was a Medicaid requirement. *Id.* at ¶ 9. And another patient was informed that Medicaid does not pay for care if patients refuse to answer firearm-ownership questions. *Id.* at ¶ 10.

A representative of the National Rifle Association reported that a child would not be examined if the parent refused to answer questions about firearms in the home. That same representative testified at a subcommittee hearing that "[q]uestioning patients about gun ownership to satisfy a political agenda . . . needs to stop." *Id.*

**B**

Based on these six anecdotes, the Florida Legislature enacted FOPA, which did several things. First, the Act created Fla. Stat. § 790.338, entitled "Medical privacy concerning firearms; prohibitions; penalties; exceptions." Second, the Act added language to Fla. Stat. § 456.072 to provide disciplinary measures for violations of its provisions. Third, the Act amended Fla. Stat. § 381.026 (the Florida Patient's Bill of Rights and Responsibilities).

The four FOPA provisions at issue here, all contained in § 790.338, are the record-keeping, inquiry, anti-discrimination, and anti-harassment provisions. The record-keeping provision, § 790.338(1), states that a doctor or medical professional "may not intentionally enter any disclosed information concerning firearm ownership into [a] patient's medical record" if he or she "knows that such information is not relevant to the patient's medical care or safety, or the safety of others." The inquiry provision, § 790.338(2), states that a doctor or medical professional "should refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home" unless he or she in "good faith believes that this information is relevant to the patient's medical care or safety, or the safety of others[.]" The anti-discrimination provision, § 790.338(5), states that a doctor or medical professional "may not discriminate

7

against a patient based solely" on the patient's ownership and possession of a firearm. The anti-harassment provision, § 790.338(6), states that a doctor or medical professional "should refrain from unnecessarily harassing a patient about firearm ownership during an examination."[1]

Through its use of a relevancy standard, FOPA's record-keeping and inquiry provisions prevent doctors and medical professionals from asking *all* patients, or *all* patients with children, whether they own firearms or have firearms in their homes, or from recording answers to such questions. In the panel's view, such inquiries (and record-keeping) are appropriate only if the doctor or medical professional has "some particularized information about the individual patient, for example, that the patient is suicidal or has violent tendencies[.]" *Wollschlaeger IV*, 814 F.3d at 1179 (record-keeping provision). *See also id.* at 1180 (inquiry provision). So a doctor or medical professional violates FOPA if he or she gives all new patients an intake questionnaire which asks about firearms in the home.

FOPA provides that violations of the record-keeping and inquiry provisions, among others, "constitute grounds for disciplinary action" by Florida's Board of Medicine. *See* § 790.338(8). Another Florida statute, as amended by FOPA, states that "violating *any* of the provisions" of FOPA, as set forth in § 790.338, "*shall*

---

[1] For convenience, Fla. Stat. § 790.338 is reproduced in the appendix.

constitute grounds for which . . . disciplinary actions . . . may be taken." *See* § 456.072(1)(nn) (emphasis added).

Statutorily, FOPA violations are punishable by a fine of up to $10,000 per offense, a letter of reprimand, probation, suspension, compulsory remedial education, or permanent license revocation. *See* § 456.072(2)(a)-(j); Joint Statement of Undisputed Facts, D.E. 87, at ¶ 11. In 2014, after the district court's ruling, the Board of Medicine issued regulations that characterize transgressions of FOPA as minor administrative violations. *See* Fla. Adm. Code § 64B13-15.005(1)(l). Two years later, in 2016, the Board promulgated regulations that provide mandatory penalties for first and second violations of FOPA. For a first violation of FOPA, the Board "*shall impose* a penalty of reprimand and a fine of $250," and for a second violation it "*shall impose* a penalty of reprimand up to suspension, require continuing education, and a fine of $1,000." Fla. Adm. Code § 64B18-14.002(61) (emphasis added).

## II

The state officials argue that we lack subject-matter jurisdiction because two of Article III's justiciability requirements—standing and ripeness—are absent. *See* Appellants' En Banc Br. at 17–30. Like the district court, *see Wollschlaeger I*, 880 F. Supp. 2d at 1257–61, and the panel, *see Wollschlaeger IV*, 814 F.3d at 1172–77, we disagree.

9

To have standing under Article III, a plaintiff "must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014). "Proximate causation," however, "is not a requirement of Article III standing[.]" *Id.* at 1391 n.6.

Ripeness, which like standing originates from Article III, is a "justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements[.]'" *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807 (2003) (citation omitted). In assessing whether a dispute is concrete enough to be ripe, we "evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* at 808.

This is one of those cases where "the Article III standing and ripeness issues . . . 'boil down to the same question.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 n.5 (2014) (citation omitted). And that question is whether the doctors who filed suit, in this pre-enforcement posture, are threatened with injury fairly traceable to the challenged provisions of FOPA—the record-keeping, inquiry, anti-discrimination, and anti-harassment provisions—such that there is a sufficient hardship to them if we withhold consideration until there is enforcement

10

action.  *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007); *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995).

## A

"When an individual is subject to [the threatened enforcement of a law], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law."  *Driehaus*, 134 S. Ct. at 2342 (citing other Supreme Court cases as examples).  A person "c[an] bring a pre-enforcement suit when he 'has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution[.]'" *Id.* (citation omitted).  *See also ACLU v. The Florida Bar*, 999 F.2d 1486, 1494 & n.13 (11th Cir. 1993) (explaining that a plaintiff must have an objectively reasonable belief about the likelihood of disciplinary action).

It is undisputed that the individual plaintiffs, as doctors, wish to say and do what they believe FOPA prevents them from saying and doing.  They filed affidavits in the district court explaining that they routinely ask all patients (or their parents) about firearm ownership in order to assess safety risks, and some believe that "information about firearm safety is always relevant to a patient's preventive care."  *Wollschlaeger I*, 880 F. Supp. 2d at 1257.  Due to the challenged provisions of FOPA, and in order to avoid discipline by the Board of Medicine, these doctors are engaged in self-censorship.  Against their professional judgment,

11

they are no longer asking patients questions related to firearm ownership, no longer using questionnaires with such questions, and/or no longer maintaining written records of consultations with patients about firearms. *See* Joint Statement of Undisputed Facts, D.E. 87, at ¶¶ 24–26, 32–39; *Wollschlaeger I*, 880 F. Supp. 2d at 1257–58 (citing some of the affidavits).

Where the "alleged danger" of legislation is "one of self-censorship," harm "can be realized even without an actual prosecution." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988). Given the undisputed facts presented to the district court, the doctors have established that, but for FOPA, they would engage in speech arguably protected by the First Amendment. As a result, they have satisfied the first prong of the *Driehaus* standard. *See Int'l Soc'y for Krishna Consciousness of Atlanta v. Evans*, 601 F.2d 809, 821 (5th Cir. 1979) ("To insist that a person must break the law in order to test its constitutionality is to risk punishing him for conduct which he may have honestly thought was constitutionally protected.").[2]

_____

[2] Although we construe the anti-discrimination provision in a way that does not regulate speech, at the time the plaintiffs filed suit it was unclear whether that provision would reach questions, statements, or record-keeping related to firearm ownership. In the district court, the state officials noted that, like the anti-harassment provision, the anti-discrimination provision could apply to repeated inquiries about firearm ownership. *See* Defendants' Response to Motion for Preliminary Injunction, D.E. 49, at 7–8. At no time did the state officials say, or represent, that the anti-discrimination provision was limited to conduct. Instead, they asserted that "discrimination and harassment can take many forms, not all involving speech." *See* Defendants' Second Amended Motion for Summary Judgment, D.E. 93, at 17. And so, like the

12

**B**

The challenged FOPA provisions target speech and conduct by doctors and medical professionals, and violations of those provisions can result in disciplinary sanctions by the Board of Medicine.  For the reasons that follow, the doctors who filed suit have shown a credible threat of prosecution, a standard which we have described as "quite forgiving."  *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998) (citation omitted).

First, FOPA was challenged soon after it was enacted, and Florida has since vigorously defended the Act in court.  As a result, "an intent to enforce [the challenged provisions] may be inferred."  *Harrell v. The Florida Bar*, 608 F.3d 1241, 1257 (11th Cir. 2010).

Second, although the state officials insist that one of the provisions of FOPA—the anti-harassment provision—merely contains recommendations (because it uses the words "should refrain"), the same cannot be said for the record-keeping ("may not"), inquiry ("shall . . . refrain"), and anti-discrimination ("may not") provisions.  More fundamentally, the argument ignores § 456.072(1)(nn), which states (emphasis ours) that "violating *any* of the provisions" of § 790.338—i.e., even the so-called suggestive ones—"*shall*

---

panel, *see Wollschlaeger IV*, 814 F.3d at 1175 n.7, we conclude that the plaintiffs have standing to challenge the anti-discrimination provision.

constitute grounds for which . . . disciplinary actions . . . may be taken." *See also* § 790.338(8) (providing that violations of subsections (1)–(4) "constitute grounds for disciplinary action"). Indeed, the Board of Medicine's recent regulations provide that certain disciplinary sanctions "shall" be imposed for violations of FOPA, *see* Fla. Adm. Code § 64B18-14.002(61), and that is enough to show a credible threat of enforcement. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 15–16 (2010).

Third, as the panel correctly explained, "[l]aws that provide for disciplinary action in case of violation—such as [FOPA]—should generally not be interpreted as hortatory," *Wollschlaeger IV*, 814 F.3d at 1176, even if they do not contain prohibitory words. *See also Powhatan Steamboat Co. v. Appomattox R.R. Co.*, 65 U.S. (24 How.) 247, 252 (1860) ("[W]here [a] statute inflicts a penalty for doing an act, although the act itself is not expressly prohibited, yet to do the act is unlawful, because it cannot be supposed that the Legislature intended that a penalty should be inflicted for a lawful act."). Notably, Florida law is in accord with this principle: "*[A] penalty implies* a prohibition, though there are no prohibitory words in the statute." *Bryan's Heirs v. Dennis*, 4 Fla. 445, 455 (Fla. 1852) (emphasis in original).

Fourth, we are not persuaded by the state officials' reliance on a July 18, 2011, letter from the Board of Medicine, which purportedly "clarif[ied]" that

FOPA "does not prohibit the asking of . . . questions [about gun ownership] but rather recommends that health care providers and facilities should refrain from asking them." Joint Statement of Undisputed Facts, D.E. 87, at ¶ 14. For starters, the Board has not engaged in any formal (i.e., binding) rulemaking interpreting the substantive provisions of FOPA, so the July 18 letter does not offer much solace to doctors and medical professionals who have to ascertain their meaning. Nor has the Board issued a declaratory statement dealing with FOPA's application to a particular doctor's unique set of circumstances, as it is allowed to do under Florida law. *See* Fla. Stat. § 120.565; *Fla. Dep't of Business & Prof'l Regulation v. Investment Corp. of Palm Beach*, 747 So. 2d 374, 385 (Fla. 1999).

In addition, and significantly, the July 18 letter—written after this action was filed—contradicts earlier positions taken by the Board. For example, on the very day that FOPA was signed into law, the Rules/Legislative Committee of the Board determined, "[a]fter discussion," that a "violation of [FOPA] falls under a failure to comply with a legal obligation and the current disciplinary guidelines for this violation would apply." Joint Statement of Undisputed Facts, D.E. 87, at ¶ 12. And on June 14, 2011, the Board mailed a letter to doctors informing them that, under FOPA, they were "*prohibited* from inquiring about the ownership of firearms or ammunition unless the information is relevant to the patient's medical care or safety, or the safety of others." *Id.* at ¶ 13 (emphasis added). That same

15

letter further declared that FOPA "*prohibits* [doctors and health care facilities] from intentionally entering any disclosed information concerning firearm ownership into a patient's health record if the information is not relevant to the patient's medical care or safety, or the safety of others." *Id.* (emphasis added).

In sum, "the Board has not been consistent in its position[,]" *Wollschlaeger IV*, 814 F.3d at 1176, and its July 18 letter does not diminish the doctors' objectively reasonable fear of discipline. On this record the individual plaintiffs, who are looking down the barrel of the Board's disciplinary gun, are not required to guess whether the chamber is loaded.[3]

## III

Before tackling the four challenged provisions, we address the appropriate standard of review.

## A

In cases at the margin, it may sometimes be difficult to figure out what constitutes speech protected by the First Amendment. But this is not a hard case in that respect. We conclude, as did the district court, *see Wollschlaeger I*, 880 F. Supp. 2d at 1261, and the panel, *see Wollschlaeger IV*, 814 F.3d at 1183, that the record-keeping, inquiry, and anti-harassment provisions of FOPA constitute speaker-focused and content-based restrictions on speech.

---

[3] Because the individual plaintiffs—the doctors—have Article III standing, we need not address the standing of the other plaintiffs. *See Bowsher v. Synar*, 478 U.S. 714, 721 (1986).

16

The record-keeping and inquiry provisions expressly limit the ability of certain speakers—doctors and medical professionals—to write and speak about a certain topic—the ownership of firearms—and thereby restrict their ability to communicate and/or convey a message.  As a result, there can be no doubt that these provisions trigger First Amendment scrutiny.   "[S]peech is speech, and it must be analyzed as such for purposes of the First Amendment." *King v. Governor of New Jersey*, 767 F.3d 216, 229 (3d Cir. 2014).

The anti-harassment provision also limits speech on the basis of its content.  Although it is certainly possible to harass through conduct, *see, e.g.*, Black's Law Dictionary 831 (10th ed. 2014), we think the limiting text of the anti-harassment provision ("during an examination") is more normally read in this medical setting to refer to questions or advice to patients concerning the subject of firearm ownership. We therefore agree with the panel that the anti-harassment provision regulates speech based on content for the purposes of the First Amendment.  *See Wollschlaeger IV*, 814 F.3d at 1185 ("A natural reading of the [anti-harassment] provision would seem to indicate that it is primarily concerned with verbal harassment . . . . [W]e think that on balance the provision substantially regulates speech[.]").  And anti-harassment laws, insofar as they regulate speech based on content, are subject to First Amendment scrutiny. *See DeJohn v. Temple Univ.*,

537 F.3d 301, 316 (3d Cir. 2008); *Saxe*, 240 F.3d at 207; *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596–97 (5th Cir. 1995).

## B

The record-keeping, inquiry, and anti-harassment provisions of FOPA are speaker-focused and content-based restrictions. They apply only to the speech of doctors and medical professionals, and only on the topic of firearm ownership. *See Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2227 (2015); *Sorrell*, 564 U.S. at 567; *Burk v. Augusta-Richmond County*, 365 F.3d 1247, 1251 (11th Cir. 2004). Even if the restrictions on speech can be seen as viewpoint neutral—a point we need not address—that does not mean that they are content-neutral. "[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Reed*, 135 S. Ct. at 2230. "Innocent motives," moreover, "do not eliminate the danger of censorship presented by a facially content-based statute, as future government officials may one day wield such statutes to suppress disfavored speech." *Id.* at 2229. *Accord* Cass R. Sunstein, Democracy and the Problem of Free Speech 169 (1993) ("When government regulates content, there is a large risk that the restriction really stems from something illegitimate: an effort to foreclose a controversial viewpoint, to stop people from being offended by certain topics and views, or to prevent people from being persuaded by what others have to say.").

18

Content-based restrictions on speech normally trigger strict scrutiny. *See Reed*, 135 S. Ct. at 2231; *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000); *Humanitarian Law Project*, 561 U.S. at 27–28. *See also Am. Booksellers v. Webb*, 919 F.2d 1493, 1500 (11th Cir. 1990) ("content-based restrictions on speech survive constitutional scrutiny only under extraordinary circumstances"). Such review is properly skeptical of the government's ability to calibrate the propriety and utility of speech on certain topics. *See Thomas v. Collins*, 323 U.S. 516, 544 (1945) (Jackson, J., concurring) ("[T]he state may prohibit the pursuit of medicine as an occupation without [a] license but I do not think it could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought."). But we need not decide whether strict scrutiny applies here, because (as we discuss below) the record-keeping, inquiry, and anti-harassment provisions of FOPA fail even under heightened scrutiny as articulated in *Sorrell*, 564 U.S. at 569–70 ("Vermont's law imposes a content- and speaker-based burden on respondents' own speech. That consideration . . . requires heightened judicial scrutiny.").

## C

According to the state officials, the First Amendment is not implicated because any effect on speech is merely incidental to the regulation of professional conduct. *See* Appellants' En Banc Br. at 30–34. Keeping in mind that "[n]o law

19

abridging freedom of speech is ever promoted as a law abridging freedom of speech," Rodney A. Smolla, Free Speech in an Open Society 58 (1992), we do not find the argument persuasive.

Saying that restrictions on writing and speaking are merely incidental to speech is like saying that limitations on walking and running are merely incidental to ambulation. *See Wollschlaeger III*, 797 F.3d at 918–19 (Wilson, J., dissenting). We concur with the Third Circuit's assessment that the "enterprise of labeling certain verbal or written communications 'speech' and others 'conduct' is unprincipled and susceptible to manipulation." *King*, 767 F.3d at 228.

The state officials, however, rely on Justice White's framework for evaluating the speech of those who are engaged in a profession. In a concurrence he wrote 30 years ago, Justice White suggested that when a person is exercising judgment with respect to a particular client, he is "engaging in the practice of a profession" and his speech is "incidental to the conduct of the profession," such that his First Amendment interests are diminished. *See Lowe v. S.E.C.*, 472 U.S. 181, 232 (1985) (White, J., concurring in the judgment). So, if "the government enacts generally applicable licensing provisions limiting the class of persons who may practice [a] profession, it cannot be said to have enacted a limitation on freedom of speech or the press subject to First Amendment scrutiny." *Id.* In a later dissent, Justice White proposed that regulations of so-called professional

20

speech receive only rational basis review. *See Thornburgh v. Am. College of Obstetricians & Gynecologists*, 476 U.S. 747, 802 (1986) (White, J., dissenting). On the other hand, laws receive heightened First Amendment scrutiny if they reach a professional who does not have a "personal nexus" to a particular client and who is merely speaking generally. *See Lowe*, 472 U.S. at 232 (White, J., concurring in the judgment).[4]

Although we applied Justice White's framework in *Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011), that case is not of much help here, as it involved a Florida law requiring that interior designers obtain a state license, and not one which limited or restricted what licensed interior designers could say on a given topic in practicing their profession. The law, as we said, did "not implicate constitutionally protected activity under the First Amendment." *Id.  See also Moore-King v. County of Chesterfield*, 708 F.3d 560, 563–64, 569–70 (4th Cir. 2013) (applying Justice White's approach to uphold local laws setting licensing, permitting, and zoning requirements for fortune tellers).

---

[4] Justice White's approach is supported by some First Amendment theorists and criticized by others. *Compare, e.g.,* Robert C. Post, Democracy, Expertise, and Academic Freedom: A First Amendment Jurisprudence for the Modern State 24 (2012) ("[O]utside public discourse, the First Amendment permits the state to control the autonomy of speakers in order to protect the dignity of the targets of speech."), *with, e.g.*, Daniel Halberstam, *Commercial Speech, Professional Speech, and the Constitutional Status of Social Institutions*, 147 U. Pa. L. Rev. 771, 840–41 (1999) ("[A]lthough a professional may be viewed as engaged in the transaction of selling his professional advice, one must, of course, distinguish between the offer . . . and the actual presentation of the professional advice, which is no more a 'commercial transaction' than is the actual writing or reading of a book or newspaper that is available for sale.").

The Ninth Circuit also adopted Justice White's approach, but in a case upholding a California law prohibiting mental health practitioners from providing sexual orientation change efforts (SOCE) therapy—meant to change a person's sexual orientation from homosexual to heterosexual—to children under the age of 18. *See Pickup v. Brown*, 740 F.3d 1208, 1225–29 (9th Cir. 2013) (as amended on rehearing). Importantly, however, the law in *Pickup*—like the law in *Locke*—did not restrict what the practitioner could say or recommend to a patient or client. *See id.* at 1223 (explaining that the California law did not prevent mental health providers "from expressing their views to patients, whether children or adults, about SOCE, homosexuality, or any other topic" or from "recommending SOCE to patients, whether children or adults"). The *Pickup* panel, therefore, concluded that the law "regulate[d] conduct" even though it covered the verbal aspects of SOCE therapy. *See id.* at 1229.

There are serious doubts about whether *Pickup* was correctly decided. As noted earlier, characterizing speech as conduct is a dubious constitutional enterprise. *See also id.* at 1215–21 (O'Scannlain, J., dissenting from denial of rehearing en banc) (criticizing the *Pickup* panel for, among other things, not providing a "principled doctrinal basis" for distinguishing "between utterances that are truly 'speech,' on the one hand, and those that are, on the other hand, somehow 'treatment' or 'conduct'"). In any event, *Pickup* is distinguishable on its facts and

does not speak to the issues before us.  To the extent that *Pickup* provides any relevant insight, it recognizes that "doctor-patient communications *about* medical treatment receive substantial First Amendment protection," *id.* at 1227, and is therefore consistent with our approach.

A more analogous—and more persuasive—Ninth Circuit case is *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), which struck down, on First Amendment grounds, a federal policy which threatened doctors with revocation of their DEA prescription authority if they recommended the medicinal use of marijuana to their patients.  The Ninth Circuit recognized that doctor-patient speech (even if labeled professional speech) is entitled to First Amendment protection, and invalidated the policy because it was content- and viewpoint-based and did not have the requisite "narrow specificity."  *See id.* at 637–39.  In so doing, the Ninth Circuit rejected the government's paternalistic assertion that the policy was valid because patients might otherwise make bad decisions.  *See id.* at 637.[5]

The Supreme Court has never adopted or applied Justice White's rational basis standard to regulations which limit the speech of professionals to clients based on content.  *See Wollschlaeger IV*, 814 F.3d at 1190; *Pickup*, 740 F.3d at

---

[5] The Fifth Circuit assumed the validity of Justice White's approach to professional speech in *Serafine v. Branaman*, 810 F.3d 354, 359–60 (5th Cir. 2016), and struck down a Texas law which did not allow a candidate for political office to refer to herself as a psychologist on her campaign website.  Because the candidate was communicating with the public at large and not providing advice to a client, the Fifth Circuit's opinion in *Serafine* does not address the restrictions imposed by the FOPA provisions before us.

1218 (O'Scannlain, J., dissenting from denial of rehearing en banc). Indeed, on at least a couple of occasions, the Court has applied heightened scrutiny to regulations restricting the speech of professionals. *See, e.g.*, *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542–48 (2001) (holding that a federal law—which prohibited attorneys working for entities receiving funds from the Legal Services Corporation from challenging existing welfare laws and from advising their clients about such challenges—violated the First Amendment because it limited "constitutionally protected expression" and "alter[ed] the traditional role of the attorneys"); *N.A.A.C.P. v. Button*, 371 U.S. 415, 438–44 (1963) (holding that a Virginia solicitation law, which prohibited organizations like the N.A.A.C.P. from finding or retaining lawyers for individual litigants and paying those attorneys a per diem fee for their professional services, violated the First Amendment because the state had not advanced any substantial regulatory interest to justify the prohibition).

In *Button*, Virginia argued (much as the state officials do here) that it had a "subordinating interest in the regulation of the legal profession . . . which justifie[d] limiting [the N.A.A.C.P.'s] First Amendment rights," but the Supreme Court rejected the argument out of hand, and essentially applied a form of heightened scrutiny: "[O]nly a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First

Amendment freedoms.  Thus it is no answer to the constitutional claims . . . to say . . . that the purpose of [this law] was merely to insure high professional standards and not to curtail free expression."  *Id.* at 438–39.  What the Supreme Court said in concluding its analysis in *Button* seems to fit like a glove here: "[A] State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights."  *Id.* at 439.

Given that the Supreme Court cited and discussed *Button* with approval recently in *Reed*, 135 S. Ct. at 2229, the state officials cannot successfully rely on a single paragraph in the plurality opinion of three Justices in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 884 (1992) (upholding state requirement that doctors inform women seeking to terminate their pregnancies of the risks associated with both childbirth and abortion), to support the use of rational basis review here.  In any event, as Judge Wilkinson correctly explained for the Fourth Circuit, the *Casey* "plurality did not hold sweepingly that all regulation of speech in the medical context merely receives rational basis review." *Stuart v. Camnitz*, 774 F.3d 238, 249 (4th Cir. 2014).  *See also District of Columbia v. Heller*, 554 U.S. 570, 628 n.27 (2008) ("Obviously, the [rational basis] test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms.").

Our own circuit precedent also cuts against adoption of a rational basis standard for evaluating so-called professional speech.  In *Kingsville Independent Sch. Dist. v. Cooper*, 611 F.2d 1109, 1113 (5th Cir. 1980), we held that a role-playing technique used by a public high-school history teacher in the classroom was "protected activity" under the First Amendment even if it was characterized as "private expression."  We then explained that the school district's decision to not renew the teacher's contract "for discussions conducted in the classroom [could not] be upheld unless the discussions 'clearly . . . overbalance[d] [the teacher's] usefulness as an instructor.'"  *Id.*[6]

In sum, we do not think it is appropriate to subject content-based restrictions on speech by those engaged in a certain profession to mere rational basis review. If rationality were the standard, the government could—based on its disagreement with the message being conveyed—easily tell architects that they cannot propose buildings in the style of I.M. Pei, or general contractors that they cannot suggest the use of cheaper foreign steel in construction projects, or accountants that they cannot discuss legal tax avoidance techniques, and so on and so on.

---

[6] *Cooper* may not be applicable to the speech of public employees after *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("when  public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline"), but its core First Amendment holding—that certain so-called professional speech is protected by the First Amendment—remains good law for those (like the doctors here) who are not public employees. *Cooper* relied in part on *Givhan v. Western Line Consolidated Sch. Dist.*, 439 U.S. 410, 414 (1979), for its First Amendment analysis, *see Kingsville*, 611 F.2d at 1113, and the Supreme Court cited *Givhan* with approval in *Garcetti*, 547 U.S. at 420–21.

26

**IV**

We now turn to FOPA's record-keeping, inquiry, and anti-harassment provisions. Because these provisions fail to satisfy heightened scrutiny under *Sorrell*, they obviously would not withstand strict scrutiny. We therefore need not decide whether strict scrutiny should apply.

Under *Sorrell*, the state officials "must show at least that the [provisions] directly advance[ ] a substantial governmental interest and that the measure[s] [are] drawn to achieve that interest. There must be a 'fit between the legislature's ends and the means chosen to accomplish those ends.'" 564 U.S. at 572 (citation omitted). And "[u]nlike rational basis review, th[is] . . . standard does not permit us to supplant the precise interests put forward by the State with other suppositions." *Edenfield v. Fane*, 507 U.S. 761, 768 (1993).

"The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 391 (2000). In *Edenfield*, for example, the Supreme Court struck down an anti-solicitation regulation for CPAs in part because the State Board of Accountancy had not presented any "studies that suggest personal solicitation of prospective business clients by CPAs creates the dangers . . . that the Board claim[ed] to fear," and had not provided "any anecdotal evidence . . . that

27

validate[d] the Board's [interests]."  507 U.S. at 771.  Two years later, the Court

distinguished *Edenfield* and upheld a direct-mail solicitation regulation for Florida

lawyers because the Florida Bar had "submitted a 106-page summary of its [two]-

year study of lawyer advertising and solicitation . . . contain[ing] data—both

statistical and anecdotal—supporting the Bar's [position] that the Florida public

view[ed] direct-mail solicitations in the immediate wake of accidents as an

intrusion on privacy that reflect[ed] poorly upon the profession."  *Florida Bar v.

Went For It, Inc.*, 515 U.S. 618, 626–27 (1995) (describing the anecdotal record as

"noteworthy for its breadth and detail").

Here the Florida Legislature, in enacting FOPA, relied on six anecdotes and

nothing more.   There was no other evidence, empirical or otherwise, presented to

or cited by the Florida Legislature.  *See* Joint Statement of Undisputed Facts, D.E.

87, at ¶¶ 2–10.   Although in some circumstances "[a]necdotal evidence is not

shoddy per se," *Flanigan's Enterprises., Inc. v. Fulton County, Ga.*, 596 F.3d

1265, 1279 (11th Cir. 2010) (citation and internal quotations marks omitted)

(applying the less demanding test for content-neutral regulations from *United

States v. O'Brien*, 391 U.S. 367, 376 (1968)), the question for us is whether, in a

state with more than 18 million people as of 2010, *see* Florida Statistical Abstract 5

(45th ed. 2011),  six anecdotes (not all of which address the same concerns) are

sufficient to demonstrate harms that are "real, [and] not merely conjectural," such

28

that the FOPA provisions "will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) (plurality opinion).

## A

The first interest asserted by the state officials is protecting, from "private encumbrances," the Second Amendment right of Floridians to own and bear firearms. *See* Appellants' En Banc Br. at 45–46. We accept that the protection of Second Amendment rights is a substantial government interest, but nevertheless conclude that FOPA's record-keeping, inquiry, and anti-harassment provisions fail to satisfy heightened scrutiny.

The first problem is that there was no evidence whatsoever before the Florida Legislature that any doctors or medical professionals have taken away patients' firearms or otherwise infringed on patients' Second Amendment rights. This evidentiary void is not surprising because doctors and medical professionals, as private actors, do not have any authority (legal or otherwise) to restrict the ownership or possession of firearms by patients (or by anyone else for that matter). The Second Amendment right to own and possess firearms does not preclude questions about, commentary on, or criticism for the exercise of that right. So, as the district court aptly noted, *see Wollschlaeger I*, 880 F. Supp. 2d at 1264, there is no actual conflict between the First Amendment rights of doctors and medical

29

professionals and the Second Amendment rights of patients that justifies FOPA's speaker-focused and content-based restrictions on speech.

We note that since 1989 Florida has made it a misdemeanor to fail to secure firearms which are obtained or possessed by minors without supervision, *see* Fla. Stat. § 790.174, and the general questioning of patients about firearm ownership is consistent with this state policy on firearm safety. The Florida Legislature has recognized that "a tragically large number of Florida children have been accidentally killed or seriously injured by negligently stored firearms; that placing firearms within the reach or easy access of children is irresponsible, encourages such accidents, and should be prohibited; and that legislative action is necessary to protect the safety of our children." Fla. Stat. § 790.173(1) (legislative findings).

Even if there were some possible conflict between the First Amendment rights of doctors and medical professionals and the Second Amendment rights of patients, the record-keeping, inquiry, and anti-harassment provisions do "not advance [the legislative goals] in a permissible way." *Sorrell*, 564 U.S. at 577. The record here demonstrates that some patients do not object to questions and advice about firearms and firearm safety, and some even express gratitude for their doctors' discussion of the topic. *See* Joint Statement of Undisputed Facts, D.E. 87, at ¶ 21. *Cf. Edenfield*, 507 U.S. at 772 (highlighting that one of the reports contradicted rather than strengthened the State Board's position). The record-

30

keeping, inquiry, and anti-harassment provisions do not provide for such patients a means by which they can hear from their doctors on the topic of firearms and firearm safety, and that is problematic under heightened scrutiny. *See Sorrell*, 564 U.S. at 578 ("The defect in Vermont's law is made clear by the fact that many listeners find detailing instructive."). *See also Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972) ("In a variety of contexts this Court has referred to a First Amendment right to 'receive information and ideas.'") (citation omitted).

In "the fields of medicine and public health . . . information can save lives." *Sorrell*, 564 U.S. at 566. Doctors, therefore, "must be able to speak frankly and openly to patients." *Conant*, 309 F.3d at 636. *Cf. Trammel v. United States*, 445 U.S. 40, 51 (1980) (noting that "the physician must know all that a patient can articulate" and that "barriers to full disclosure would impair diagnosis and treatment"). Florida may generally believe that doctors and medical professionals should not ask about, nor express views hostile to, firearm ownership, but it "may not burden the speech of others in order to tilt public debate in a preferred direction." *Sorrell*, 564 U.S. at 578–79.

## B

The second interest, say the state officials, is the protection of patient privacy, i.e., keeping private facts away from the public eye. *See* Appellants' En Banc Br. at 46–47. We recognize that protection of individual privacy is a

31

substantial government interest, *see, e.g.*, *Falanga v. State Bar of Ga.*, 150 F.3d 1333, 1344 (11th Cir. 1998), but that is not enough to sustain the three provisions at issue given other privacy protections in Florida law and the record before us.

One of the FOPA provisions that has not been challenged, § 790.338(4), states in relevant part that patients "may decline to answer or provide any information regarding ownership of a firearm . . . or the presence of a firearm in the domicile of the patient or a family member of the patient." So any patients who have privacy concerns about information concerning their firearm ownership can simply refuse to answer questions on the topic. Because the state officials do not explain why § 790.338(4) is insufficient to protect the privacy of patients who do not want others (including doctors and medical professionals) to know that they own or possess a firearm, they have failed to meet their burden under heightened scrutiny. *See Sorrell*, 564 U.S. at 575 ("[T]he State offers no explanation why remedies other than content-based rules would be inadequate.").

According to the state officials, the three provisions also safeguard the privacy of patients' firearm ownership from the chilling effect of disclosure and record-keeping. But Florida law already places significant limits on the disclosure of a patient's confidential medical records, *see* Fla. Stat. § 456.057(7)(a), and there is no evidence that doctors or medical professionals have been improperly disclosing patients' information about firearm ownership. None of the anecdotes

cited by the Florida Legislature involved the improper disclosure or release of patient information concerning firearm ownership.

The state officials rely in part on the panel's assertion that the challenged FOPA provisions are constitutional because there is a danger that information electronically stored by doctors and medical professionals about firearm ownership might be subject to hacking, theft, or some other intrusion. *See Wollschlaeger IV*, 814 F.3d at 1195 n.22 & 1197. Under heightened scrutiny, however, a court may not come up with hypothetical interests and rationales (or discover new evidence) that might support legislation that restricts speech. *See Edenfield*, 507 U.S. at 770–71. The Florida Legislature did not rely on this rationale in enacting FOPA, and the state officials did not assert this rationale in the district court. As a result, they cannot raise it here.

## C

The third interest, according to the state officials, is ensuring access to health care without discrimination or harassment. *See* Appellants' En Banc Br. at 48–49. Florida certainly has a substantial interest in making sure that its residents are able to obtain health care without discrimination—and we uphold FOPA's anti-discrimination provision below—but the three other content-based provisions are not narrowly tailored to further that interest.

Under Florida law, a doctor can terminate his or her relationship with a patient as long the patient has reasonable notice and can secure the services of another health care provider. *See Saunders v. Lischkoff*, 188 So. 815, 819 (Fla. 1939); H.R. Final Bill Analysis, Bill No. CS/CS/HB 155, D.E. 49-1, at 4 n.10 (citing *Saunders*). A couple of the anecdotes in the legislative record involve complaints that doctors threatened to end the physician-patient relationship or to refuse treatment if questions about firearm ownership were not answered. One would think that, if the prevention of such conduct was the goal, the Florida Legislature would have prohibited doctors and medical professionals from terminating their professional relationships with patients who decline to answer questions about firearm ownership. That would certainly be a less speech-restrictive solution. But FOPA does the opposite, because the second sentence of § 790.338(4) provides that a "patient's decision not to answer a question relating to the presence or ownership of a firearm does not alter existing law regarding a physician's authorization to choose his or her patients." At a hearing before the district court, the state officials confirmed that the Florida Legislature "decided that [it] didn't want to interfere with the rights of . . . physicians to terminate the relationship with the patients if there was a refusal to answer." Transcript of Evidentiary Hearing, D.E. 64, at 30 (Jul. 13, 2011).

34

We also reject the argument asserted by the panel, *see Wollschlaeger IV*, 814 F.3d at 1197–98, and championed by the state officials, *see* Appellants' En Banc Br. at 49, that FOPA's speaker-focused and content-based restrictions on speech are justified because there is a significant power imbalance between doctors and their patients, who are in a vulnerable position.  First, "the Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer," *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210 (1975), and where adults are concerned the Supreme Court has never used a vulnerable listener/captive audience rationale to uphold speaker-focused and content-based restrictions on speech.  *See Snyder v. Phelps*, 562 U.S. 443, 459–60 (2011) (explaining that the "captive audience doctrine" has been applied "only sparingly" in a couple of cases concerning content-neutral regulations protecting a person's home, and holding that a father attending his son's funeral was not captive to picketers of the ceremony).  Second, doctors and patients undoubtedly engage in some conversations that are difficult and uncomfortable, and the first sentence of § 790.338(4) already gives patients the right to refuse to answer questions about firearm ownership.  There is nothing in the record suggesting that patients who are bothered or offended by such questions are psychologically unable to choose another medical provider, just as they are permitted to do if their doctor asks too

35

many questions about private matters like sexual activity, alcohol consumption, or drug use. To borrow from *Sorrell*, "[i]t is doubtful that concern for 'a few' [patients] who may have 'felt coerced and harassed' by [doctors] can sustain . . . broad content-based [regulations] like [FOPA's record-keeping, inquiry, and anti-harassment provisions]. Many are those who must endure speech they do not like, but that is a necessary cost of freedom." *Sorrell*, 564 U.S. at 575 (citation omitted).

## D

The final interest put forth by the state officials is the need to regulate the medical profession in order to protect the public. *See* Appellants' En Banc Br. at 49. At an abstract level of generality, Florida does have a substantial interest in regulating professions like medicine. *See Watson v. State of Maryland*, 218 U.S. 173, 176 (1910). That interest, however, is not enough here.

"When the [state] defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.'" *Turner*, 512 U.S. at 664 (plurality opinion). *See also Button*, 371 U.S. at 439. As Judge Wilson noted, a state's authority to regulate a profession does not extend to the entirety of a professional's existence. *See Wollschlaeger III*, 797 F.3d at 909 (Wilson, J., dissenting). *See also Thomas*, 323 U.S. at 544 (Jackson, J., concurring). Florida does not have

36

carte blanche to restrict the speech of doctors and medical professionals on a certain subject without satisfying the demands of heightened scrutiny. *See Button*, 371 U.S. at 438–39.

"Injuries are the leading cause of death and morbidity among children older than one year, adolescents, and young adults." Joint Statement of Undisputed Facts, D.E. 87, at ¶ 25. As a result, the American Medical Association and the American Academy of Pediatrics each recommend that doctors and pediatricians routinely ask patients about firearm ownership, and educate them about the dangers posed to children by firearms that are not safely secured. *Id.* at ¶¶ 4, 16. These policies, however, do not justify FOPA's speaker-focused and content-based restrictions on speech. There is no claim, much less any evidence, that routine questions to patients about the ownership of firearms are medically inappropriate, ethically problematic, or practically ineffective. Nor is there any contention (or, again, any evidence) that blanket questioning on the topic of firearm ownership is leading to bad, unsound, or dangerous medical advice. *Cf.* Eric J. Crossen et al., *Preventing Gun Injuries in Children*, 36 Pediatrics Rev. 43, 47–48 (2015) ("safe storage of firearms and ammunition helps to insulate children against unintentional firearm injuries").

Two of the six anecdotes that prompted the Florida Legislature to enact FOPA involved patients falsely being told that Medicaid would not pay for

medical care unless firearm ownership questions were answered. If the Florida Legislature thought that these two anecdotes were symptomatic of a state-wide problem, it could have enacted a law which prohibited doctors and medical professionals from making such false and misleading statements. *Cf. Ibanez v. Florida Dep't of Bus. & Prof'l Regulation, Bd. of Accountancy*, 512 U.S. 136, 142 (1994) ("only false, deceptive, or misleading commercial speech may be banned"); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771–72 (1976) (explaining that the First Amendment does not prohibit restrictions on false or misleading commercial speech). But it did not, instead choosing to pass provisions broadly restricting truthful speech based on content. *See Rubin v. Coors Brewing Co.*, 514 U.S. 476, 490–91 (1995) (striking down a labeling provision under the Federal Alcohol Administration Act because "several alternatives, such as directly limiting the alcohol content of beers, prohibiting marketing efforts emphasizing high alcohol strength . . . or limiting the labeling ban only to malt liquors" were available). Given that the applicable standard of care encourages doctors to ask questions about firearms (and other potential safety hazards), and that the challenged FOPA provisions are not appropriately tailored to address the concerns identified by the anecdotes in the record, Florida's general interest in regulating the medical profession is insufficient to satisfy heightened scrutiny.

**E**

The anti-discrimination provision, § 790.338(5), is of a slightly different caliber, as it prohibits discrimination "against a patient based solely" on his or her ownership and possession of a firearm. Although we have recognized that "anti-discrimination laws are [not] categorically immune from First Amendment challenge[s]," *Booth v. Pasco County*, 757 F.3d 1198, 1212 (11th Cir. 2014) (citation and internal quotation marks omitted), § 790.338(5) does not, on its face, implicate the spoken or written word.

When a statute is "susceptible" to an interpretation that avoids constitutional difficulties, that is the reading we must adopt. *See S. Utah Mines & Smelters v. Beaver County*, 262 U.S. 325, 331 (1923). To discriminate generally means to treat differently, *see, e.g.*, The American Heritage Dictionary of the English Language 517 (4th ed. 2009), and here we can uphold FOPA's anti-discrimination provision by construing it to apply to non-expressive conduct such as failing to return messages, charging more for the same services, declining reasonable appointment times, not providing test results on a timely basis, or delaying treatment because a patient (or a parent of a patient) owns firearms. When § 790.338(5) is limited in this way, there is no First Amendment problem, as the plaintiffs conceded at oral argument. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 572 (1995) (explaining that anti-

39

discrimination laws "do not, as a general matter, violate the First or Fourteenth Amendments"); *Wisconsin v. Mitchell*, 508 U.S. 476, 487–88 (1993) (compiling a list of cases upholding anti-discrimination laws against First Amendment challenges). We therefore conclude that FOPA's anti-discrimination provision, as interpreted today, is not unconstitutional.[7]

## V

FOPA does not contain a severability clause, but the district court held that the unconstitutional provisions can and should be severed from the rest of the Act. *See Wollschlaeger I*, 880 F. Supp. 2d at 1269–70. Applying Florida law to this question, *see Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (explaining that the severability of state statutory provisions is "a matter of state law"), we agree with the district court.

In Florida, where a law does not contain a severability clause, unconstitutional provisions will be severed if "(1) [they] can be separated from the remaining valid provisions[;] (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void[;] (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other[;] and (4) an act complete in itself remains after the invalid provisions are stricken." *State v.*

---

[7] The plaintiffs do not challenge the district court's ruling that the anti-discrimination provision is not unconstitutionally vague. *See Wollschlaeger I*, 880 F. Supp. 2d at 1268.

*Catalano*, 104 So. 3d 1069, 1080 (Fla. 2012) (citation and internal quotation marks omitted). The "key determination is whether the overall legislative intent is still accomplished without the invalid provisions." *Id.* at 1080–81.

We have concluded that FOPA's record-keeping, inquiry, and anti-harassment provisions violate the First Amendment, and that the anti-discrimination provision, as construed, does not. Our ruling therefore does not affect five provisions of FOPA: the provision relating to firearm inquiries by emergency medical technicians and paramedics, § 790.338(3); the provision allowing patients to decline to answer questions or provide information about firearm ownership but explaining that a patient's decision not to answer such questions "does not alter existing law regarding a physician's authorization to choose his or her patients," § 790.338(4); the provision prohibiting discrimination, § 790.338(5); the provision prohibiting insurers from denying coverage, increasing premiums, and otherwise discriminating against an applicant or insured based on the lawful ownership of firearms or ammunition, but allowing insurers to consider the fair market value of firearms or ammunition in setting premiums for scheduled personal property coverage, § 790.338(7); and the provision stating that violations of subsections (1)–(4) constitute grounds for disciplinary action, § 790.338(8).

It is our "affirmative duty to preserve the validity of legislative enactments when it is at all possible to do so," *Coral Springs St. Sys., Inc. v. City of Sunrise*,

371 F.3d 1320, 1347–48 (11th Cir. 2004) (citation and internal quotation marks omitted), and we believe that the Florida Legislature would have wanted the rest of FOPA to continue in effect. First, the remaining provisions, given their language and pronouncements, can operate independently of the invalid ones. Second, some of the remaining provisions regulate a different group of persons (e.g., insurers) than the ones which we have found constitutionally wanting. Third, the Legislature's overall purpose in enacting FOPA—protecting the rights of firearm owners in the area of health care—can still be furthered by some of the provisions unaffected by our decision. For example, if the remaining provisions continue in effect, patients will be able to refuse to answer questions put to them in the medical setting about their ownership of firearms. And firearm owners will have protection against certain forms of discrimination by doctors and medical professionals. In the words of the district court, "it cannot be said that the [L]egislature would never have passed" the valid provisions without the unconstitutional ones. *Wollschlaeger I*, 880 F. Supp. 2d at 1269. "A complete act remains even if the invalid portions of [FOPA] are stricken." *Id.*

"We owe the work of the elected representatives of the people of Florida respect[,] and we will invalidate no more of [FOPA] than we must." *Frazier ex rel. Frazier v. Winn*, 535 F.3d 1279, 1283 (11th Cir. 2008). We therefore sever the record-keeping (§ 790.338(1)), inquiry (§ 790.338(2)), and anti-harassment

(§ 790.338(6)) provisions of FOPA and permanently enjoin their enforcement.  We express no view as to the interpretation or validity of the remaining provisions of FOPA, which are not before us.[8]

## VI

The record-keeping, inquiry, and anti-harassment provisions of FOPA violate the First Amendment, but the anti-discrimination provision, as construed, does not.  The district court's judgment is affirmed in part and reversed in part, and the case is remanded so that the judgment and permanent injunction can be amended in accordance with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

[8] Obviously, the portion of § 790.338(8) providing that violations of the record-keeping and inquiry provisions constitute grounds for disciplinary action no longer has any effect.

43

MARCUS, Circuit Judge:

The Court has correctly determined that the record-keeping, inquiry, and anti-harassment provisions of Florida's Firearm Owners' Privacy Act (FOPA), Fla. Stat. § 790.338(1)–(2), (6), plainly target core First Amendment speech. Because the State has failed to demonstrate that these provisions are narrowly drawn to directly and materially advance a substantial government interest, they cannot withstand heightened scrutiny. See Florida Bar v. Went For It, Inc., 515 U.S. 618, 624 (1995).

The anti-harassment provision, Fla. Stat. § 790.338(6), also suffers from a second constitutional infirmity. This provision says that health-care practitioners "shall respect a patient's legal right to own or possess a firearm and should refrain from unnecessarily harassing a patient about firearm ownership during an examination." Fla. Stat. § 790.338(6). In addition to failing heightened scrutiny, FOPA's ban on only unnecessary harassment is incomprehensibly vague. While FOPA proscribes "unnecessarily harassing" behavior, a definition of what such conduct entails is markedly absent from the pages of the Florida Statutes.

Reasonable doctors are thus left guessing as to when their "necessary" harassment crosses the line and becomes "unnecessary" harassment -- and wrong guesses will yield severe consequences. The statute provides that a violation of any provision "shall constitute grounds for which disciplinary actions . . . may be

44

taken." Id. at § 456.072(1)(nn). Violators of the Act risk suspension or permanent revocation of their medical licenses; restriction of their practices to certain settings, conditions, or numbers of hours; fines of up to $10,000 for each separate offense; probation; refunds of fees billed; and remedial education, among others. Id. at § 456.072(2)(b)–(d), (f), (i)–(j). With so much at risk, a statute written in muted shades of gray will not suffice.

It is, by now, a "basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). A law "can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000) (citing City of Chicago v. Morales, 527 U.S. 41, 56–57 (1999)); see also Harris v. Mexican Specialty Foods, Inc., 564 F.3d 1301, 1311 (11th Cir. 2009) (stating that a law is unconstitutionally vague "if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case") (quoting Giaccio v. Pennsylvania, 382 U.S. 399, 402–03 (1966)). This doctrine reflects the basic principle that a statute either forbidding or requiring

45

an action "in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application[ ] violates the first essential of due process of law." Harris, 564 F.3d at 1310 (quotations omitted).

"[S]tandards of permissible statutory vagueness are strict in the area of free expression." NAACP v. Button, 371 U.S. 415, 432 (1963). Generally, the void for vagueness doctrine encompasses "at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." FCC v. Fox Television Stations, Inc., 132 S. Ct. 2307, 2317 (2012). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." Id.; see also Reno v. Am. Civil Liberties Union, 521 U.S. 844, 871–72 (1997) ("The vagueness of [content-based regulations of speech] . . . raise[s] special First Amendment concerns because of its obvious chilling effect on free speech."); Winters v. New York, 333 U.S. 507, 509 (1948) ("It is settled that a statute so vague and indefinite, in form and as interpreted, as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech is void, on its face, as contrary to the Fourteenth Amendment."). Vague laws force potential speakers to "'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were

46

clearly marked," thus silencing more speech than intended. Baggett v. Bullitt, 377 U.S. 360, 372 (1964) (quoting Speiser v. Randall, 357 U.S. 513, 526 (1958)). Content-based regulations thus require "a more stringent vagueness test." See Vill. of Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499 (1982). While "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989), "government may regulate in the area" of First Amendment freedoms "only with narrow specificity." Button, 371 U.S. at 433.

FOPA's anti-harassment statute is not vague merely because it is an anti-harassment statute. "Harass" has an ordinary, commonly understood meaning: "to annoy persistently." Merriam-Webster (2016). While this common meaning alone might pass constitutional muster, other Florida statutes go further and supplement this familiar definition by including statute-specific descriptions to convey the precise scope of behavior that constitutes punishable harassment. For example, Florida's anti-stalking statute defines prohibited harassment as "a course of conduct directed at a specific person which causes substantial emotional distress to that person and serves no legitimate purpose." Fla. Stat. § 784.048(1)(a). Likewise, Florida employees are forbidden from engaging in sexual harassment, which is defined as "unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature from any person directed

47

towards or in the presence of an employee or applicant" in specific enumerated circumstances. Fla. Admin. Code r. 60L-36.004(1). Both of these provisions restrict harassment by providing some guidance regarding the specific conduct or speech that is banned.

Thus, "harassment" has a common meaning standing alone, and laws proscribing harassing behavior can be further delimited in scope through context and formal definitions. Had § 790.338(6) simply banned "harassment about firearm ownership during an examination," our review would have revealed poor tailoring and inadequate state interests as the sole causes of its constitutional demise. But instead of defining a specific type of harassment or simply applying the term according to its common usage, the State takes the plain word and renders it incomprehensible by appending a wholly nebulous adverb. Doctors are to refrain from "<u>unnecessarily</u> harassing" their patients about firearm ownership and safety. Fla. Stat. § 790.338(6). This locution allows that some harassment may be permissible or even necessary. Indeed, we expect doctors to doggedly exhort unhealthy patients to exercise more, eat less, or stop smoking, even when such admonishments may "annoy persistently." Section 790.338(6) must -- but does not -- provide doctors with fair notice regarding either the level of harassment that may be permitted as a necessary element of medical care or the point at which harassment metamorphoses into illegal activity.

48

Demarcating this line with some clarity and precision is crucial. In the absence of any attempt at a statutory definition of what constitutes "unnecessarily harassing" conduct, it is not clear whether what is "unnecessary" is to be measured from the point of view of the doctor or the patient. If the former, how is a doctor to know when his advice has become "unnecessarily" harassing? A doctor who believes his counseling beneficial and thinks the advice necessary to fulfill his professional responsibilities might have a tendency to overestimate the amount of advice he can give before he has engaged in "unnecessarily harassing" conduct. This difficulty is exacerbated by the fact that the patients who are most irritated by a doctor's advice are often those in greatest need of persistence. A doctor may feel professionally obligated to "necessarily harass" a patient who obstinately resists his pleas to wear a motorcycle helmet, to childproof household electrical outlets, or to store a loaded firearm beyond his toddler's reach. If the doctor's well-intentioned advice is rebuffed, he may wish to repeat his warnings two, three, even four times. He may wish to provide literature documenting the risks and hazards associated with an improperly secured firearm in the home or to share a harrowing account of a child killed by an accidental discharge. The more likely a doctor may believe that a patient is in particular need of advice, the more likely the patient may believe that the plentiful advice constitutes "unnecessary" harassment.

By contrast, if what is "unnecessary" is measured from the patient's

49

perspective, how is a doctor to predict his patients' individual tolerances for hearing firearm-safety advice? If a doctor gives the same firearm-safety advice to two patients, the patients might have drastically different responses given their ownership of firearms and their existing household safety precautions. A particularly sensitive patient might have a very low threshold for firearm-safety advice from his doctor and might construe any amount of counseling as unnecessary. A patient more receptive to his doctor's advice might tolerate more counseling before his threshold is reached. The anti-harassment provision utterly fails to provide any notice to a doctor who must predict his patients' individual tolerances, because "[c]onduct that annoys some people does not annoy others." Coates v. City of Cincinnati, 402 U.S. 611, 614 (1971). These difficulties illuminate the vagueness problem before us: Who is to know -- and who is to decide -- when good-faith persistence devolves into unnecessary harassment? Without further guidance, doctors are left in the dark.

The State's attempts to define the term fail to burn through the fog. When asked to define "necessary harassment," the State replied that "the term 'unnecessary' emphasizes that it's in the discretion of the physician to determine if they need to push you on the issue that they're inquiring about" and that "it's left to the discretion and determination of the physician, their judgment in treating the patient." The panel adopted a similar interpretation and remarked that "so long as

50

a physician is operating in good faith . . . and is providing only firearm safety advice that is relevant and necessary, he need not fear discipline at the hands of the Board." Wollschlaeger v. Governor of the State of Florida, 814 F.3d 1159, 1182 (11th Cir. 2015).

But this interpretation stands in stark contrast to the plain text of the statute: "A health care practitioner . . . shall respect a patient's legal right to own or possess a firearm and should refrain from unnecessarily harassing a patient about firearm ownership during an examination." Fla. Stat. § 790.338(6). While the inquiry provision allows a doctor to ask about firearm ownership and safety if he "in good faith" believes the questions to be "relevant to the patient's medical care or safety," Fla. Stat. § 790.338(2), this safe harbor is notably absent from the anti-harassment provision. Because a legislature "generally acts intentionally when it uses particular language in one section of a statute but omits it in another," Dep't of Homeland Sec. v. MacLean, 135 S. Ct. 913, 919 (2015), we must infer that a doctor's good-faith belief permits inquiries -- but not harassment -- regarding firearm ownership and safety. The State's interpretation completely ignores the differing construction of the inquiry and the anti-harassment provisions, and it must be rejected in favor of the plain text. See Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253–54 (1992) (noting that in interpreting a statute, a court "must presume that a legislature says in a statute what it means and means in a

51

statute what it says there"). The panel nevertheless took the State at its word and concluded that a physician acting in good faith "need not fear discipline at the hands of the Board." Wollschlaeger, 814 F.3d at 1182. But we cannot find clarity in a wholly ambiguous statute simply by relying on the benevolence or good faith of those enforcing it. See, e.g., United States v. Stevens, 559 U.S. 460, 480 (2010) ("[T[he First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").

Even if we were to entertain the State's interpretation and add the words "in good faith" to the anti-harassment provision, such a construction would render the provision -- and the inquiry provision -- completely null. If a doctor may claim "good faith" in the face of criticism over how many times he repeats, how loudly he insists, how intrusively he inquires, and how offensively he counsels -- in short, how and when he harasses -- then the statute is toothless. If the State's argument is followed to its logical conclusion, a doctor would be able to maintain full immunity from enforcement with a simple assertion that he believed his harassment to be necessary.

However, doctors would find little solace in so generous a reading. A lone patient's complaint is sufficient to initiate an investigation into a doctor's conduct, Fla. Stat. § 456.073, and a disgruntled patient is likely to disagree with his doctor

about precisely how much harassment is truly necessary. The risks of such proceedings are staggering. Well-intentioned doctors may be hauled before disciplinary boards, their reputations diminished, and their medical careers tarnished. And it is of little comfort to note that "patients by themselves cannot subject physicians to discipline." Wollschlaeger, 814 F.3d at 1182. Even the mere filing of a complaint can have serious consequences for a doctor's career. As one plaintiff testified, "[m]any job applications, hospital credentialing forms, and public service vetting forms require doctors to note if they have ever been reported to the Board, regardless of whether the complaint was well-founded." Doctors deserve more notice before they are subjected to these consequences, but we can find nothing in this statute, whether taken as a whole or read piece by piece, that offers a conscientious physician any guidance in discerning when "necessary" harassment has devolved into "unnecessary" and actionable speech.

In this quintessential First Amendment area, the State may not hinge liability on a phrase so ambiguous in nature. And it most certainly may not do so when devastating consequences attach to potential violations. Doctors are entitled to know how far they may press their points and how persistently they may make their cases. The anti-harassment provision does not provide any guidance. Instead, it forces doctors to choose between adequately performing their professional obligation to counsel patients on health and safety on the one hand

53

and the threat of serious civil sanctions on the other. Doctors can choose silence and self-censorship, thereby shouldering the burden of knowing they could have said more, counseled more, and warned more before a tragic accident. Or they may proceed with their speech and potentially face punishment according to the arbitrary whims of annoyed patients or a Board of Medicine that is wholly unrestrained by clear statutory guidelines. Because of the anti-harassment provision's undeniable ambiguity, the risk of constitutional injury is simply too great. This vagueness is inconsistent with the command of the First Amendment.

WILSON, Circuit Judge, whom MARTIN, Circuit Judge, joins as to Part III, concurring:

I was a member of the original panel in this case, in which I submitted three separate dissents arguing that Florida's Firearm Owners' Privacy Act (the Act) violates the First Amendment. Accordingly, I concur with the Majority that the Act is unconstitutional. However, the Majority applies intermediate scrutiny to strike down the Act. I would reach the same result by applying strict scrutiny.

The Act imposes a content- and viewpoint-based restriction on physicians' speech. It restricts physicians' communications with patients about a specific subject—the possession of firearms—to prohibit advocating a specific viewpoint— firearm safety. My reading of Supreme Court precedent leads me to believe that strict scrutiny is the appropriate level of scrutiny for such a restriction on speech. *See, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. ___, ___, 135 S. Ct. 2218, 2227 (2015); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565–66, 131 S. Ct. 2653, 2664 (2011); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 45, 130 S. Ct. 2705, 2734 (2010). The record-keeping, inquiry, and anti-harassment provisions of the Act do not survive this demanding standard.

## I.    Strict Scrutiny

I write separately to underscore the importance of applying the most demanding standard of scrutiny to this content-based law. Under the First

Amendment, the "government has no power to restrict expression because of its . . . content." *Ashcroft v. ACLU*, 535 U.S. 564, 573, 122 S. Ct. 1700, 1707 (2002) (internal quotation marks omitted).  The Supreme Court recently reiterated that laws that restrict speech "based on its communicative content . . . are presumptively unconstitutional."  *See Reed*, 135 S. Ct. at 2226.  A content-based speech restriction can stand only if it survives strict scrutiny.  *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813, 120 S. Ct. 1878, 1886 (2000).

While my previous dissents in this case evaluated the Act through the lens of intermediate scrutiny, after the Supreme Court's decision in *Reed* last year reiterated that content-based restrictions must be subjected to strict scrutiny, I am convinced that it is the only standard with which to review this law.  *See Reed*, 135 S. Ct. at 2227.  A law is content-based if it "applies to particular speech because of the topic discussed or the idea . . . expressed."  *Id.*  The *Reed* Court cited as an "obvious" content-based distinction "defining regulated speech by particular subject matter."  *Id.*  The restrictions imposed by the Act depend entirely on the content of speech.  The Act aims to suppress speech on only one topic: firearms.  It is hard to imagine a more paradigmatic example of a content-based law.

The state's subversive attempt to stop a perceived political agenda chills speech based on not only content but also a particular viewpoint.  The Act silences

doctors who advance a viewpoint about firearms with which the state disagrees. The Act's legislative history indicates that the concern motivating the law was firearm-safety messages that were perceived as a political agenda against firearm ownership. Statements by government officials explaining the reasons for an action can indicate an improper motive. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268, 97 S. Ct. 555, 565 (1977); *see also Sorrell*, 564 U.S. at 565, 131 S. Ct. at 2663 ("[A] statute's stated purposes may . . . be considered."). This viewpoint discrimination is a "blatant" and "egregious form of content discrimination" and thus provides further support for an application of strict scrutiny. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829, 115 S. Ct. 2510, 2516 (1995).

Applying strict scrutiny to content-based speech restrictions is also essential to protecting the values that the First Amendment seeks to protect. We must make sure that there is "no realistic possibility that official suppression of ideas is afoot." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390, 112 S. Ct. 2538, 2547 (1992). The government must not regulate speech "based on hostility—or favoritism—towards the underlying message expressed." *Id.* at 386, 112 S. Ct. at 2545. Florida, perhaps guided by a paternalistic notion that it needs to protect its citizens from viewpoints they do not like, prohibits doctors from discussing an entire topic and advocating a position with which it does not agree. This it cannot do.

57

Content-based restrictions on speech are permitted only when they fall within a few historic and traditional categories, such as obscenity or defamation. *See Alvarez*, 132 S. Ct. at 2544. Absent from any such category of unprotected speech is truthful speech by physicians.[1] However, the Supreme Court has not squarely addressed the appropriate level of protection for professional speech. While I agree with the majority that rational basis is not appropriate, I hesitate to compare this case to other professional speech situations in which the state has a valid interest in regulating a specialized profession. *See, e.g.*, *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1051–52, 111 S. Ct. 2720, 2733 (1991). Proscribing access to a profession is entirely different than prohibiting the speech of an entire group of professionals. *See Thomas v. Collins*, 323 U.S. 516, 544, 65 S. Ct. 315, 329 (Jackson, J., concurring) ("[T]he state may prohibit the pursuit of medicine as an occupation without its license but I do not think it could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought."). Because, as the district court noted, other regulations in this

---

[1] Admittedly, the Supreme Court has acknowledged that there may exist some categories of speech that have not yet been specifically identified in our case law. *See United States v. Stevens*, 559 U.S. 460, 470, 130 S. Ct. 1577, 1586 (2010). However, before allowing a category of speech to fall into the exemptions from the normal prohibition on content-based restrictions, "the Court must be presented with persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription." *See Alvarez*, 132 S. Ct. at 2547 (citing *Brown v. Entm't Merch. Assn.*, 564 U.S. 786, 792, 131 S. Ct. 2729, 2734 (2011)). Here, the government has failed to persuade us. Just because this regulation lies in the realm of private professionals, there is not a historic tradition that would warrant exempting regulation of truthful speech by doctors.

realm govern the access to or practice of a profession, they do not "prohibit truthful . . . speech within the scope of the profession." *Wollschlaeger v. Farmer*, 880 F. Supp. 2d 1251, 1262 (S.D. Fla. 2012); *cf. Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374–75, 122 S. Ct. 1497, 1507–08 (2002); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547–48, 121 S. Ct. 1043, 1052 (2001); *Conant v. Walters*, 309 F.3d 629, 637–38 (9th Cir. 2002).

The Act does not survive strict scrutiny because it is not narrowly tailored to compelling state interests. I echo my previous dissents' conclusions regarding the state's interests: the Act does not survive even intermediate scrutiny. *See Wollschlaeger v. Governor of Florida*, 760 F.3d 1195, 1256–67 (11th Cir. 2014) (Wilson, J., dissenting); *Wollschlaeger v. Governor of Florida*, 797 F.3d 859, 919–930 (11th Cir. 2015) (Wilson, J., dissenting).

## II.    The Anti-Harassment Provision

I concur with Judge Marcus's analysis of the anti-harassment provision and his conclusion finding it void for vagueness. As I stated in my previous dissents, even if medical intuition tells a doctor that persistence is necessary, he will not know at what point his persistent questions constitute the harassment barred by the Act. The Act fails to establish a line between medically necessary advice and unnecessary harassment, and thus requires doctors to self-censor or risk losing their license. Because people of "common intelligence" are left guessing as to the

59

meaning of the Act, see *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1310 (11th Cir. 2009) (internal quotation marks omitted), the provision is void for vagueness.

### III.    The Anti-Discrimination Provision

Although I concur with the majority's conclusion regarding the anti-discrimination provision, I still have doubts regarding the provision's constitutionality.  If the provision was narrowed to encompass only conduct, such as adjusting office hours or rates,[2] I would not find issue with it.  However, as the legislative history makes clear, the anecdotes of discrimination that motivated the Act all stemmed from speech.  And it strains credulity to imagine scenarios in which this Act will be used to punish only conduct, and not speech.

Even if the Act is construed to apply only to conduct, leaving the anti-discrimination provision in place risks chilling speech.  Doctors may be hesitant to inquire about firearm ownership, as inquiries are strong evidence of a discriminatory motive.  *See generally Barbano v. Madison Cnty.*, 922 F.2d 139 (2d Cir. 1990).  Doctors may be legitimately worried that, if their patients subsequently complain, their initial inquiries will be used as evidence of discrimination.  Such fear of punishment could lead to doctors avoiding asking those questions—the

---

[2] I still have doubts about how realistic these proposed hypotheticals are.  There is no evidence in the record that the state's proposed discriminatory 'conduct' (e.g., denying referrals, creating longer wait times, cancelling appointments) actually occurred, or is likely to occur.

precise type of chilling effect we should fear. "[I]n the field[] of medicine . . . where information can save lives," *Sorrell*, 564 U.S. at 566, 131 S. Ct. at 2664, this result is all the more dire. With safety at stake, we cannot afford to silence these voices.

I also worry that the discrimination provision appears to be a variant of the harassment provision. Because the majority opinion strikes down the harassment provision, my concern is that the state will now use the discrimination provision to punish harassing conduct. The Act defines neither harassment nor discrimination. It seems to me that the same speech that constituted harassment could now constitute "discriminatory harassment"[3] and thus be prohibited.

However, I also recognize that the Supreme Court has stated that anti-discrimination provisions prohibiting discriminatory conduct "do not, as a general matter, violate the First or Fourteenth Amendments." *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 571–72, 115 S. Ct. 2338, 2346 (1995). Based on this guiding principle, and on a narrow reading of the provision, I would not strike down the discrimination provision. But I remain skeptical of the government's motivation behind this Act. And I urge that in all future cases reviewing content- and viewpoint-based speech regulations we remain

---

[3] Justice Alito, then circuit judge, once used the phrase "discriminatory harassment." *See Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001).

steadfast in our resolve to protect speech and be wary of any law that muzzles

entire categories of speech.

WILLIAM PRYOR, Circuit Judge, joined by HULL, Circuit Judge, concurring:

I concur in the majority opinion, but I write separately to reiterate that our decision is about the First Amendment, not the Second. The Second Amendment "guarantee[s] the individual right to possess and carry weapons," *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008), and enshrines a fundamental right "necessary to our system of ordered liberty" that applies to the states through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010). Our decision recognizes that protecting that fundamental right also serves a substantial government interest. Majority Op. at 29. And for that reason, Florida can protect its citizens from discrimination on the basis of their exercise of their right to bear arms. Majority Op. at 39–40. But the profound importance of the Second Amendment does not give the government license to violate the right to free speech under the First Amendment.

"[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). Content-based regulations of speech "pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). The

power of the state must not be used to "drive certain ideas or viewpoints from the marketplace," even if a majority of the people might like to see a particular idea defeated. *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991).

The First Amendment is a counter-majoritarian bulwark against tyranny. "Congress shall make no law . . . abridging the freedom of speech," U.S. Const. Amend. I, cannot mean "Congress shall make no law abridging the freedom of speech a majority likes." No person is always in the majority, and our Constitution places out of reach of the tyranny of the majority the protections of the First Amendment. The promise of free speech is that even when one holds an unpopular point of view, the state cannot stifle it. The price Americans pay for this freedom is that the rule remains unchanged regardless of who is in the majority. "He that would make his own liberty secure must guard even his enemy from oppression; for if he violates this duty, he establishes a precedent that will reach to himself." Thomas Paine, Dissertation on First-Principles of Government 37 (1795).

We would resolve this appeal in exactly the same way if the facts were reversed. Suppose doctors were inspired to ask patients about gun ownership because the doctors believed that possession of firearms is an important means of ensuring health and safety. One can easily imagine circumstances in which a medical professional might justifiably encourage a patient (or a third party) in a

64

dangerous situation to take measures to protect herself. In fact, following *Tarasoff v. Regents of University of California*, 551 P.2d 334 (Cal. 1976), almost every state took action to require or allow mental health professionals to warn third parties of patients' threats to their safety. *See Mental Health Professionals' Duty to Warn*, National Conference of State Legislatures (Sept. 28, 2015), http://www.ncsl.org/research/health/mental-health-professionals-duty-to-warn.aspx. A state legislature motivated by anti-gun sentiment might have passed the same inquiry, record-keeping, and anti-harassment provisions that are in the Firearm Owners' Privacy Act to prevent doctors from *encouraging* their patients to own firearms, and those laws would be equally unconstitutional. The First Amendment does not discriminate on the basis of motivation or viewpoint—the principle that protects pro-gun speech protects anti-gun speech with equal vigor.

That the Act focuses on doctors is irrelevant. The need to prevent the government from picking ideological winners and losers is as important in medicine as it is in any other context. *See Thomas v. Collins*, 323 U.S. 516, 544 (1945) (Jackson, J., concurring) ("I do not think [the state] could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought."). The history of content-based restrictions on physicians' speech provides a cautionary tale:

> During certain historical periods, . . . governments have overtly politicized the practice of medicine, restricting access to medical

65

information and directly manipulating the content of doctor-patient discourse. For example, during the Cultural Revolution, Chinese physicians were dispatched to the countryside to convince peasants to use contraception. In the 1930s, the Soviet government expedited completion of a construction project on the Siberian railroad by ordering doctors to both reject requests for medical leave from work and conceal this government order from their patients. In Nazi Germany, the Third Reich systematically violated the separation between state ideology and medical discourse. German physicians were taught that they owed a higher duty to the "health of the Volk" than to the health of individual patients. Recently, Nicolae Ceausescu's strategy to increase the Romanian birth rate included prohibitions against giving advice to patients about the use of birth control devices and disseminating information about the use of condoms as a means of preventing the transmission of AIDS.

Paula Berg, *Toward a First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice*, 74 B.U. L. Rev. 201, 201–02 (1994) (footnotes omitted). Health-related information is more important than most topics because it affects matters of life and death. Doctors help patients make deeply personal decisions, and their candor is crucial. If anything, the doctor-patient relationship provides more justification for free speech, not less.

If we upheld the Act, we could set a precedent for many other restrictions of potentially unpopular speech. Think of everything the government might seek to ban between doctor and patient as supposedly "irrelevant" to the practice of medicine. Without the protection of free speech, the government might seek to ban discussion of religion between doctor and patient. The state could stop a surgeon from praying with his patient before surgery or punish a Christian doctor for asking

66

patients if they have accepted Jesus Christ as their Lord and Savior or punish an atheist for telling his patient that religious belief is delusional. Without the protection of free speech, the government might seek to censor political speech by doctors. The state might prevent doctors from encouraging their patients to vote in favor of universal health care or prohibit a physician from criticizing the Affordable Care Act. Some might argue that such topics are irrelevant to a particular patient's immediate medical needs, but the First Amendment ensures that doctors cannot be threatened with state punishment for speech even if it goes beyond diagnosis and treatment.

These examples do not even begin to address the number of highly controversial topics that doctors discuss as a direct part of their medical responsibilities. Could a state prohibit a pro-life doctor from discouraging a patient from aborting her unborn child? Could a state prohibit a doctor from advising a patient about sex-reassignment surgery? Could a state prohibit a doctor from advising parents to vaccinate their children? Could a state prohibit a doctor from recommending abstinence or encouraging safe sexual behavior? What about organ donation or surrogacy or terminal care? What about drugs or alcohol or tobacco? Could a state legislature prevent a doctor from explaining the risks or benefits of a vegan diet? Or prevent a doctor from explaining the risks or benefits of playing football? This type of thought experiment should give us pause. If today the

majority can censor so-called "heresy," then tomorrow a new majority can censor what was yesterday so-called "orthodoxy."

We should not be swayed by the argument that the First Amendment may be curtailed when other constitutional rights need "protection." In this context, "protection" is a misnomer. The Constitution protects individual rights from *government* infringement, but freedom thrives on private persuasion. That the government may not establish a religion, U.S. Const. Amend. I., or ban handguns, U.S. Const. Amend. II, does not suggest that private individuals may not start a church or give away their guns. The Second Amendment is not infringed when private actors argue that guns are dangerous any more than when private actors support the positions of the National Rifle Association. The "theory of our Constitution" is that "the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). The Florida Legislature overstepped the boundaries of the First Amendment when it determined that the proper remedy for speech it considered "evil" was "enforced silence," as opposed to "more speech." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring).

And we should keep in mind that the Second Amendment is not the only constitutional right that might receive such "protection" at the expense of the freedom of speech. If we say that we must "place the doctors' right to question

their patients on the scales against the State's compelling interest in fully effecting the guarantees of the Second Amendment," *Wollschlaeger v. Governor of the State of Fla. (Wollschlaeger IV)*, 814 F.3d 1159, 1200 (11th Cir. 2015) *reh'g en banc granted, opinion vacated*, 649 Fed. App'x 647 (11th Cir. 2016), others can say that "[w]e must place students' right to express" unpopular views about race, religion, or sex "against the State's compelling interest in fully effecting the guarantees of the Equal Protection Clause." Eugene Volokh, *Can Florida Restrict Doctors' Speech to Patients About Guns?*, Wash. Post (Feb. 4, 2016), https://www.washingtonpost.com/news/volokh-conspiracy/wp/2016/02/04/can-florida-restrict-doctors-speech-to-patients-about-guns. The precedent that would allow the government to restrict speech any time its officials can identify a different right they believe more important is dangerous indeed.

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . ." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (Jackson, J.). Our decision applies this timeless principle to speech between doctors and patients, regardless of the content. The First Amendment requires the protection of ideas that some people might find distasteful because tomorrow the tables might be turned.

TJOFLAT, Circuit Judge, dissenting:

Although I strongly disagree with the result reached by the majority, I write separately to directly address a question studiously avoided by this Court—What level of First Amendment scrutiny applies to the challenged provisions of the Florida Firearm Owners Privacy Act (the "Act")[1] targeting speech?[2]

I fully agree with my colleagues that the inquiry, record-keeping, and anti-harassment[3] provisions of the Act constitute content-based regulations of speech specifically targeting medical professionals. Accordingly, these challenged provisions must survive some level of First Amendment scrutiny under the Free

---

[1] Fla. Stat. § 790.338(1)–(2), (5), (6).

[2] I join the majority's extensive and well-reasoned finding that the group of physicians and physician-advocacy groups (the "Plaintiffs") mounting a facial challenge to the Act have standing to pursue that challenge. Further, the majority correctly holds that the Act's anti-discrimination provision, Fla. Stat. § 790.338(5), applies to non-expressive conduct, making that provision immune from the First Amendment challenge brought here.

[3] The majority holds that the anti-harassment provision of the Act, Fla. Stat. § 790.338(6), is unconstitutionally vague. This provision requires health-care practitioners to "respect a patient's legal right to own or possess a firearm and should refrain from unnecessarily harassing a patient about firearm ownership during an examination." According to the majority, the use of the adverb unnecessarily is sufficient to render this provision incomprehensible. I disagree. Perhaps in isolation, the adverb unnecessarily creates some level of confusion, but statutory construction is a holistic endeavor, and we are commanded to interpret words in light of our "reading the whole statutory text [and] considering the purpose and context of the statute" as a whole. *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486, 126 S. Ct. 1252, 1257, 163 L. Ed. 2d 1079 (2006). As the panel opinion explains, the broader context of the Act establishes that the necessity requirement insures that a medical professional has made a particularized determination of medical relevance before harassing a patient about firearm ownership. *See Wollschlaeger v. Governor of Fla.*, 814 F.3d 1159, 1181 (11th Cir. 2015), *vacated*, 649 F. App'x 647 (11th Cir. 2016). Like the rest of the Act, this provision merely obliges health-care providers to focus on providing medical care of the highest quality in the exam room rather than pursuing some other agenda. *See id.* at 1182. Even in the First Amendment context, we do not require "perfect clarity and precise guidance." *Ward v. Rock Against Racism*, 491 U.S. 781, 794, 109 S. Ct. 2746, 2755, 104 L. Ed. 2d 661 (1989). I would find that the anti-harassment provision is sufficiently clear that a person of ordinary intelligence would understand what it forbids. That is all the clarity the constitution requires.

70

Speech Clause.  I also agree that rational basis review is inapplicable here for largely the same reasons ably outlined by majority opinion.  However, by declining to elucidate and apply a particularized standard of review, the majority missed a critical opportunity to provide much needed doctrinal clarification in the wake of the Supreme Court's recent decision in *Reed v. Town of Gilbert, Ariz.*, —U.S.—, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015).  Given the uncertainty introduced by *Reed*, I write separately to lay out what is, in my view, the logical path forward for First Amendment doctrine.

To understand *Reed*'s pernicious and far reaching effects, I first provide a brief overview of Free Speech principles as they existed prior to the decision.  As any fledgling lawyer quickly realizes during bar preparation, the judicial approach to the Free Speech Clause notably emphasizes categorization, with each category designed to address the unique legal considerations posed by a specific form of speech.  *See* Rodney A. Smolla, *Professional Speech and the First Amendment*, 119 W. Va. L. Rev. 67, 82–84 (2016); *Kovacs v. Cooper*, 336 U.S. 77, 97, 69 S. Ct. 448, 459, 93 L. Ed. 513 (1949) (Jackson, J., concurring) (summarizing the numerous jurisprudential labels deployed in service of protecting speech under the First Amendment by noting that "[t]he moving picture screen, the radio, the newspaper, the handbill, the sound truck and the street corner orator have differing natures, values, abuses and dangers.  Each, in my view, is a law unto itself").  But

despite its apparent complexity, the myriad categories of contemporary First Amendment jurisprudence are united by a common focus on distinguishing regulations that target speech based on content from those that do not. *See, e.g.*, 1 Rodney A. Smolla, *Smolla and Nimmer on Freedom of Speech*, § 2:66 (2016).

As a general rule, if the government seeks to regulate speech based on content, "the usual presumption of constitutionality afforded congressional enactments is reversed; content-based regulations are presumptively invalid under the First Amendment." 16A Am. Jur. 2d *Constitutional Law* § 476 (2016). *See also One World One Family Now v. City of Miami Beach*, 175 F.3d 1282, 1286 (11th Cir. 1999) (explaining that government regulations that discriminate against protected speech based on content are subject to strict scrutiny). The Supreme Court justified this intense level of scrutiny on two theoretical grounds. First, content-based regulations of speech threaten the existence of "an uninhibited marketplace of ideas in which truth will ultimately prevail." *McCullen v. Coakley*, —U.S.—, 134 S. Ct. 2518, 2529, 189 L. Ed. 2d 502 (2014) (quotations omitted). Indeed, these regulations "raise[] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace" altogether. *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 188, 127 S. Ct. 2372, 2381, 168 L. Ed. 2d

71 (2007) (quotations and citation omitted).[4]  Second, content-based regulations of speech suggest that the government may act out of "hostility—or favoritism— towards the underlying message expressed." *R.A.V. v. St. Paul*, 505 U.S. 377, 386, 112 S. Ct. 2538, 2545, 120 L. Ed. 2d 305 (1992).  Under our system of government, this assessment is simply not one appropriate "for the government to make . . . [because] civic discourse belongs to the people." *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 372, 130 S. Ct. 876, 917, 175 L. Ed. 2d 753 (2010).

On the other hand, content neutral regulations likely fail to directly implicate such core First Amendment concerns, and so, "strict scrutiny is [typically] unwarranted." *Davenport,* 551 U.S. at 188, 127 S. Ct. at 2381.  Instead, courts usually subject content neutral regulations to intermediate scrutiny.  *See, e.g.*, *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662, 114 S. Ct. 2445, 2469, 129

---

[4] Although I do not deny that the Supreme Court long described the policy goal at the heart of the First Amendment as protecting the free marketplace of ideas, I wonder whether we have carried that ideal too far.  As many commentators have noted, a flurry of recent First Amendment cases relying on this language has effectively constitutionalized the market-based ideology underlying neoliberalism.  *See* Jedediah Purdy, *Neoliberal Constitutionalism: Lochnerism for a New Economy*, 77 Law & Contemp. Probs. 175, 198 (2014) (explaining the close parallel between a neoliberal conception of individual freedom concentrating on "making consumption decisions, and deciding how to spend money more generally to advance one's preferences" and the First Amendment).  This market-based approach to the First Amendment effectively obliterates the classic distinction between heavily-protected political speech and other, lesser forms of expressive activity, like consumer spending.  *Id.*  By conceptualizing the First Amendment as unique protection for a "marketplace of ideas," we implicitly accept that no real distinction exists between politics and markets, and so our ideas of freedom are interchangeable between these two spheres.  *Id.* at 202.  I admit to serious personal qualms regarding constitutionalizing any particular ideological framework, but I hope the alternative doctrinal framework I suggest *infra* satisfactorily resolves this creeping problem.

73

L. Ed. 2d 497 (1994); *Bell v. City of Winterpark, Fla.*, 745 F.3d 1318, 1322 (11th Cir. 2014).  Under this level of scrutiny, courts sustain content neutral regulations if they "further[] an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."  *United States v. O'Brien*, 391 U.S. 367, 377, 88 S. Ct. 1673, 1679, 20 L. Ed. 2d 672 (1968).

Under our precedent, the test for content neutrality turns on "'whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration.'" *Bell*, 745 F.3d at 1322 n.6 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 2754, 104 L. Ed. 2d 661 (1989)).  A regulation is content neutral as long as it "serves purposes unrelated to the content of expression" even if the regulation imposes incidental effects on particular speakers or messages. *Ward*, 491 U.S. at 791, 109 S. Ct. at 2754.  In short, regulation of expressive activity protected under the First Amendment is content neutral if the regulation is "'*justified* without reference to the content of the regulated speech.'"  *Id.* (emphasis original) (quoting *Clark v. Community For Creative Non-Violence*, 468 U.S. 288, 293, 104 S. Ct. 3065, 3069, 82 L. Ed. 2d 221 (1984)).  Given the significantly less

stringent scrutiny that content neutral regulations receive, this initial determination plays a critical role in the survival of a law challenged under the First Amendment.

On its face, *Reed* announced a sea change in the traditional test for content neutrality under the First Amendment, and, in the process, expanded the number of previously permissible regulations now presumptively invalid under strict scrutiny. In *Reed*, the Supreme Court explained that "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 135 S. Ct. at 2227. Under this new approach to content neutrality, the reviewing court must "consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id.* (quoting *Sorrell v. IMS Health Inc.*, —U.S.—, 131 S. Ct. 2653, 2664, 180 L. Ed. 2d 544 (2011)). Courts subject regulations that facially discriminate against speech on the basis of content to strict scrutiny, "regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 2228 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429, 113 S. Ct. 1505, 1516, 123 L. Ed. 2d 99 (1993). Courts consider even facially neutral regulations content-based if they cannot be "justified without reference to the content of the regulated speech." *Id.*

75

The concurring Justices in *Reed* noted the astonishing breadth of this newly announced standard for identifying content-based regulations and its potential to greatly expand the number of laws subjected to presumptive invalidity under strict scrutiny. *Id.* at 2235 (Breyer, J., concurring) (expressing concern that the new rule announced in *Reed* will unavoidably result in "the application of strict scrutiny to all sorts of justifiable governmental regulations"); *Id.* at 2239 (Kagan, J., concurring) (arguing that the majority approach in *Reed* forces lower courts to "strike down [reasonable] democratically enacted local laws even though no one— certainly not the majority—has ever explained why the vindication of First Amendment values requires that result."). The experiences of our sister circuits show these Justices' concerns were well founded. *See Norton v. City of Springfield, Ill.*, 806 F.3d 411, 412–13 (7th Cir. 2015) (granting a petition for rehearing and reversing the prior panel decision based on *Reed*'s expansive new understanding of the types of regulations appropriately subjected to strict scrutiny due to discrimination based on content); *Cahaly v. Larosa*, 796 F.3d 399, 404–05 (4th Cir. 2015) (outlining *Reed*'s abrogation of the Fourth Circuit's previous understanding of content neutrality and applying strict scrutiny to a law regulating robocalls in South Carolina). In my view, the First Amendment trajectory created by the *Reed* majority carries with it the dangerous potential to legitimize judicial interference in the implementation of reasonable, democratically enacted laws. In

76

my view, the First Amendment does not require such rigorous interventionism, so I outline an alternative path—one that both effectuates core First Amendment values and avoids excessive judicial interference in the everyday process of government.

Established First Amendment doctrine offers lower courts many opportunities to narrow *Reed*'s scope via cordoning speech into particular jurisprudential categories subject to less intensive forms of judicial review. *See, e.g.*, Note, *Free Speech Doctrine after* Reed v. Town of Gilbert, 129 Harv. L. Rev. 1981, 1987 (2016) (outlining available strategies for lower courts to limit *Reed*'s destabilizing influence on First Amendment jurisprudence). Many of our sister courts availed themselves of those very opportunities. *See, e.g.*, *United States v. Swisher*, 811 F.3d 299, 313 (9th Cir. 2016) (noting that certain "traditional categories of content-based restrictions that are not subject to strict scrutiny under the First Amendment"); *Expressions Hair Design v. Schneiderman*, 808 F.3d 118, 131–32 (2d Cir. 2015) (relying on the threshold distinction between speech and conduct not implicated by *Reed* to find that a challenged law regulated only conduct, not speech, and thus failed to trigger constitutional scrutiny under the First Amendment); *In re Tam*, 808 F.3d 1321, 1337–39 (Fed. Cir. 2015) (en banc) (emphasizing the critical importance of categorizing speech as commercial for purposes of avoiding the application of strict scrutiny); *CTIA–The Wireless Association v. City of Berkeley, Cal.*, 193 F. Supp. 3d 1048, 1061 (N.D. Cal. 2015)

(noting that "the Supreme Court has clearly made a distinction between commercial speech and noncommercial speech . . . and nothing in its recent opinions, including *Reed*, even comes close to suggesting that that well-established distinction is no longer valid").[5]  Indeed, a long-standing hallmark of our approach to the First Amendment recognizes that

> our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas, which are "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."

*R.A.V.*, 505 U.S. at 382–83, 112 S. Ct. at 2542–43 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S. Ct. 766, 762, 86 L. Ed. 1031 (1942)).  Given this context, it seems likely that courts will increasingly rely on a First Amendment "jurisprudence of labels" to avoid *Reed*'s outcome determinative approach to identifying content-based regulations.  *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 484, 129 S. Ct. 1125, 1140, 172 L. Ed. 2d 853 (2009) (Breyer, J., concurring).

---

[5] Courts could also avoid the implications of *Reed* by applying a watered-down version of the traditional presumption of illegitimacy the application of strict scrutiny creates.  *See Reed*, 135 S. Ct. at 2235 (Breyer, J., concurring).  However, this ill-considered approach leads inevitably to much greater difficulty in defending the critical rights protected by the First Amendment in instances truly warranting strict scrutiny.  *See id.*  After all, "[s]peech is an essential mechanism of democracy . . . [and] a precondition to enlightened self-government." *Citizens United*, 558 U.S. at 339, 130 S. Ct. at 898.  Speech deserves the very highest protection when the core principles at the heart of the First Amendment face a true threat.

While the incredibly broad sweep of *Reed* troubles me, I am not convinced that relying on formalistic line drawing exercises provides the proper solution. In my view, as in Justice Breyer's, "[t]he First Amendment requires greater judicial sensitivity both to the Amendment's expressive objectives and to the public's legitimate need for regulation than [is provided by] a simple recitation of categories." *Reed*, 135 S. Ct. at 2234 (Breyer, J., concurring). Rather than relying on strict categorical definitions as automatic triggers for particular levels of constitutional scrutiny, we should instead embrace an approach focused on the values underlying the jurisprudential significance of those categories. *See id.* Under this approach, we determine the appropriate level of scrutiny to apply to a challenged regulation by asking "whether the regulation at issue works harm to First Amendment interests that is disproportionate in light of the relevant regulatory objectives." *Id.* at 2235–36. Of course, the familiar factors underlying First Amendment doctrine guide this inquiry, including "the seriousness of the harm to speech, the importance of the countervailing objectives, the extent to which the law will achieve those objectives, and whether there are other, less restrictive ways of doing so." *Id.* at 2236. The more directly a challenged regulation impinged on speech without adequate reasons for doing so, the higher the level of constitutional scrutiny applied to the law.

79

I do not suggest that identifying a regulation as content-based regulation no longer serves a purpose in our First Amendment inquiry. But rather than serving as an "automatic trigger" for strict scrutiny, it instead acts as a proxy indicating a heightened possibility that the government seeks to impermissibly favor a particular viewpoint, or otherwise lacks adequate justification for legislative action. *Id.* at 2234. Under this approach, a more searching analysis of content-based regulations remains justifiable, but the mere presence of content discrimination, without more, need not warrant a presumption of invalidity under the First Amendment. *Id.*

Relying on the mere presence of content discrimination as the determinative factor for applying strict scrutiny under the First Amendment risks invalidating a swath of reasonable government regulations. As Justice Breyer pointed out in *Reed*, "virtually all government activities involve speech, many of which involve the regulation of speech. Regulatory programs almost always require content discrimination." *Id.* at 2234. And this problem becomes increasingly pronounced given *Reed*'s dramatic expansion of the traditional test for content neutrality. This sliding scale of constitutional scrutiny is undoubtedly more difficult to apply than the rote formalism of current First Amendment doctrine. But this approach properly centers our analysis on the relative importance of the First Amendment

80

values implicated by a particular regulation, while preventing undesirable judicial interference in the everyday business of government.

Here, the majority correctly finds that the record-keeping, inquiry, and harassment provisions of the challenged Act discriminate against speech based on content. But under the doctrinal principles outlined above, only intermediate scrutiny is appropriate. As extensively discussed in the prior panel opinion, the Act represents Florida's attempt to regulate a very specific part of the relationship between medical professional and patient. *See Wollschlaeger v. Governor of Fla.*, 814 F.3d 1159, 1167–68 (11th Cir. 2015), *vacated*, 649 F. App'x 647 (11th Cir. 2016). It does not prevent medical professionals from speaking publicly about firearms, nor does it prevent medical professionals from speaking privately to patients about firearms so long as the physician determined in good faith the relevancy of such discussion to the patient's medical care, safety, or the safety of others. The Act's narrow restrictions specifically relate to the provision of medical care, and, as such, avoid implicating the core values the First Amendment is designed to protect.

States traditionally possessed the authority to establish the bounds of good medical practice. *See, e.g.*, *Gonzales v. Oregon*, 546 U.S. 243, 271, 126 S. Ct. 904, 923, 163 L. Ed. 2d 748 (2006) (noting that "regulation of health and safety is primarily, and historically, a matter of local concern" (quotations omitted)). Two

central policy goals underwrite this expansive regulatory authority. First, doctors and other medical personnel are professionals, a concept that presupposes the existence of a code of behavior and some element of state control over that code in order to "safeguard[] the interests of the public who partake in . . . professional services." Smolla, *Professional Speech and the First Amendment*, *supra* at 100. Second, medical professionals are fiduciaries of their patients, and like other fiduciaries, typically possess "superior knowledge, expertise, experience, and stature in relation to the client that inherently places the professional in a position of superior leverage and influence." *Id.* This substantial imbalance of power, coupled with the need for patients to defer to their doctor during treatment logically necessitates state regulation of the medical profession to protect patients from the significant potential abuse that exists both within a specific fiduciary relationship and more broadly within the medical profession itself.

Of course, as extensively described in the panel opinion, not all speech by medical professionals implicates these strong state interests in regulation. *See Wollschlaeger*, 814 F.3d at 1186–92. Common sense tells us that "[t]here is a difference, for First Amendment purposes, between regulating professionals' speech to the public at large versus their direct, personalized speech with clients." *Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011). In situations where a doctor speaks on political matters outside of her professional expertise, the usual

82

justifications for stringent state regulation of medical professionals are nonexistent. *See Pickup v. Brown*, 740 F.3d 1208, 1227–28 (11th Cir. 2013) (noting that "outside the doctor-patient relationship, doctors are constitutionally equivalent to soapbox orators and pamphleteers, and their speech receives robust protection under the First Amendment"). In other situations, a doctor may speak to her patient within the confines of their existing fiduciary relationship, but regarding a matter not pertaining to medical care. Although not directly related to the doctor's duty as a professional, this form of speech still implicates the state's interest in insuring that the fiduciary relationship between doctors and patients avoids exploitation, and, accordingly, the doctor's speech is subject to less stringent First Amendment protection than would apply to her public speech on matters of general political interest. *See Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792, 95 S. Ct. 2004, 2016, 44 L. Ed. 2d 572 (1975) (explaining that the state's interest in public health and safety generates a "broad power to establish standards for licensing practitioners and regulating the practice of professions"); *Wollschlaeger*, 814 F.3d at 1187–88.

The challenged Act directly regulates speech between a medical professional and a patient on matters relevant to the provision of appropriate medical care. This form of speech implicates the state's exceedingly strong regulatory interest in both ensuring that doctors maintain proper professional standards and the state

83

adequately protects patients in their dealings with medical professionals. *See, e.g.*, *Thomas v. Collins*, 323 U.S. 516, 545, 65 S. Ct. 315, 329, 89 L. Ed. 430 (1945) (Jackson, J., concurring) (noting the duty on the part of the state to "shield[ ] the public against the untrustworthy, the incompetent, or the irresponsible" professional); *Twin-Lick Oil Co. v. Marbury*, 91 U.S. 587, 588–89, 23 L. Ed. 328 (1875) (recognizing the traditional ability of the law to regulate fiduciary relationships as a doctrine founded on "the soundest morality"). Undoubtedly, as the majority identifies, the Act discriminates based on content. But, this simple categorization, standing alone, insufficiently justifies the presumption of constitutional infirmity accompanying the application of strict scrutiny. The fact that the Act discriminates based on content is simply a helpful, but not dispositive, legal tool. *See Reed*, 135 S. Ct. at 2235 (Breyer, J., dissenting). Balancing the First Amendment risks posed by allowing content discrimination against the longstanding tradition of government regulation of medical professionals engaged in practice suggests that we should apply intermediate, rather than strict, scrutiny to the Act.

Relevant Supreme Court precedent buttresses this imminently sensible conclusion. For example, in cases where a professional generally speaks to the public on a matter unrelated to his profession, the state lacks a particularized justification for regulating the content of that speech. Accordingly, the Supreme

84

Court subjected content-based government regulations in that area to strict constitutional scrutiny. *See, e.g.*, *City of Madison Joint Sch. Dist. No. 8 v. Wis. Emp't. Relations Comm'n*, 429 U.S. 167, 176, 97 S. Ct. 421, 426, 50 L. Ed. 2d 376 (1976) (explaining that "[the government] may not ... discriminate between speakers on the basis of their employment. . . .").

On the other hand, when a professional speaks to the public on an issue related to the practice of her profession, the state's traditional regulatory interest in managing the professions come into play. Correspondingly, courts typically subject content-based speech regulations in that context to intermediate scrutiny. *See Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456, 98 S. Ct. 1912, 1918, 56 L. Ed. 2d 444 (1978) (concluding that this form of speech deserves a less searching form of constitutional scrutiny because of the longstanding state regulation of this type of expressive content). Based on the same tradition of regulation, the Supreme Court concluded that content discriminatory regulations of speech that occur in the context of a doctor discussing the risks of abortion and child birth with a patient merit heightened, rather than strict, scrutiny. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884, 112 S. Ct. 2791, 2824, 120 L. Ed. 2d 674 (1992) (joint opinion).

As the panel opinion explained, the Supreme Court's pattern of decisions, at least prior to *Reed*, form a clear trend:

85

> When the State seeks to impose content-based restrictions on speech in a context in which its regulatory interests are diminished, such as when a professional speaks to the public in a nonprofessional capacity, courts apply the most exacting scrutiny. When the State seeks to regulate speech by professionals in a context in which the State's interest in regulating for the protection of the public is more deeply rooted, a lesser level of scrutiny applies.

*Wollschlaeger*, 814 F.3d at 1191.  In light of the confusion *Reed* introduced into this already complex area of legal doctrine, we should hold that government regulations involving professional speech within a fiduciary relationship are subject only to intermediate scrutiny under the First Amendment.  Otherwise, we risk continuing confusion among state legislatures over which previously acceptable regulations *Reed* rendered presumptively unconstitutional.

Although I respectfully disagree with the determination that the challenged regulation fails heightened scrutiny—or, as I refer to it here, intermediate scrutiny—I refrain from fully retracing the exhaustive analysis to that effect outlined in the panel opinion.  *See Wollschlaeger*, 824 F.3d at 1192–02.  Instead, I wish to merely reiterate my continuing belief that the Act before us fails to represent an attempt to "drive certain ideas or viewpoints from the marketplace" or otherwise impermissibly manipulate public discussion under the guise of regulation.  *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116, 112 S. Ct. 501, 508, 116 L. Ed. 2d 476 (1991).  Instead, the Act merely

codifies the commonsense conclusion that good medical care does not require inquiry or record-keeping regarding firearms when unnecessary to a patient's care—especially not when that inquiry or record-keeping constitutes such a substantial intrusion upon patient privacy—and that good medical care never requires the discrimination [against] or harassment of firearm owners.

*Wollschlaeger*, 814 F.3d at 1168.

The majority and I agree that Florida possesses a substantial interest in protecting both Floridians' reasonable expectation of privacy during medical treatment and the full exercise of their Second Amendment rights. If that is so, then it is hard to imagine a law more precisely tailored to advance those substantial state interests than the one presently before us. The Act does not categorically restrict the speech of medical professionals on the subject of firearms. Instead, it simply requires an individualized, good faith judgment of the necessity of speech related to firearm ownership to provide competent medical care to a patient. The individualized assessment of medical appropriateness required under the Act does not foreclose the ability of a physician to question a patient, but instead carefully weighs that right against Florida's undoubtedly substantial interest in regulating the medical profession to protect the constitutional rights of all Floridians. In my judgment, the Act "narrowly protects patients in a focused manner in order to advance the State's compelling interest in protecting the Second Amendment's guarantee to keep and bear arms and patients' privacy rights in their medical records, exactly the sort of tailoring [even] strict scrutiny requires." *Id.* at 1201.

87

Therefore, I respectfully dissent from my colleagues' judgment that the First Amendment requires us to declare Florida's well-considered legislative judgment unconstitutional.

<h1 style="text-align:center">APPENDIX</h1>

Fla. Stat. § 790.338. Medical privacy concerning firearms; prohibitions; penalties; exceptions

(1) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 may not intentionally enter any disclosed information concerning firearm ownership into the patient's medical record if the practitioner knows that such information is not relevant to the patient's medical care or safety, or the safety of others.

(2) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 shall respect a patient's right to privacy and should refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home or other domicile of the patient or a family member of the patient. Notwithstanding this provision, a health care practitioner or health care facility that in good faith believes that this information is relevant to the patient's medical care or safety, or the safety of others, may make such a verbal or written inquiry.

(3) Any emergency medical technician or paramedic acting under the supervision of an emergency medical services medical director under chapter 401 may make an inquiry concerning the possession or presence of a firearm if he or she, in good faith, believes that information regarding the possession of a firearm by the patient or the presence of a firearm in the home or domicile of a patient or a patient's family member is necessary to treat a patient during the course and scope of a medical emergency or that the presence or possession of a firearm would pose an imminent danger or threat to the patient or others.

(4) A patient may decline to answer or provide any information regarding ownership of a firearm by the patient or a family member of the patient, or the presence of a firearm in the domicile of the patient or a family member of the patient. A patient's decision not to answer a question relating to the presence or ownership of a firearm does not alter existing law regarding a physician's authorization to choose his or her patients.

(5) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 may not discriminate against a patient based solely

89

upon the patient's exercise of the constitutional right to own and possess firearms or ammunition.

(6) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 shall respect a patient's legal right to own or possess a firearm and should refrain from unnecessarily harassing a patient about firearm ownership during an examination.

(7) An insurer issuing any type of insurance policy pursuant to chapter 627 may not deny coverage, increase any premium, or otherwise discriminate against any insured or applicant for insurance on the basis of or upon reliance upon the lawful ownership or possession of a firearm or ammunition or the lawful use or storage of a firearm or ammunition. Nothing herein shall prevent an insurer from considering the fair market value of firearms or ammunition in the setting of premiums for scheduled personal property coverage.

(8) Violations of the provisions of subsections (1)–(4) constitute grounds for disciplinary action under ss. 456.072(2) and 395.1055.